McCONNELL, Circuit Judge.
In February of 2002, many of the world’s most talented athletes, along with spectators, journalists, and world leaders, descended on Salt Lake City, Utah, for the 2002 Winter Olympics. In addition to the officially scheduled Olympic events, many hundreds of groups and individuals used the occasion to speak out on issues of concern through street demonstrations, distribution of pamphlets, evangelism, and other modes of expression. One of those groups was Appellant, the Utah Animal Rights Coalition (“UARC”), an advocacy organization devoted to making “the plight of animals in the world known to people in Utah.” The Appellees, defendants below, are Salt Lake City and certain officials who had the responsibility of determining when and where various groups would be permitted to demonstrate, and of issuing permits accordingly. The question is whether the slow pace of the permit process violated the First Amendment.
Almost a year before the Olympics — and well before the City had determined where Olympic events would be held — UARC submitted an application for permits to demonstrate on public property at five specified- locations. For approximately eight months, the City took no action on UARC’s application. The City then denied UARC’s application on account of conflicts with Olympics-related activities, and suggested alternative sites for UARC’s demonstrations. UARC filed an amended application and ultimately received permits to demonstrate at four locations, two of them at or near the locations requested in the amended application. Only two claims are at issue in this case: (1) a facial challenge to the then-operative ordinance, on account of its lack of written deadlines for processing permit applications, and (2) an as-applied challenge contending that the time elapsed in processing UARC’s permit application, from March 9 to November 15, 2001, was unconstitutionally prolonged.
The district court granted summary judgment to Defendants with respect to both claims. The court held that UARC lacked standing to bring either claim. In the alternative, the court granted summary judgment on the facial claim on *1251 mootness grounds, and on the merits of the as-applied claim. We affirm, but not precisely on the same grounds. We hold that neither standing nor mootness precludes resolution of UARC’s claims, but that the claims fail on the merits.
I.BACKGROUND

A. Salt Lake City’s Permit Ordinance

UARC’s application to conduct demonstrations on public property during the Olympics was processed in accordance with Salt Lake City Code § 3.50 (sometimes referred to hereafter as “the Ordinance”). The Ordinance was substantially amended in May, 2002, after the Olympics were over. The following is a summary of the relevant provisions in effect at the time.
In setting procedures for the issuance of permits, the Ordinance distinguishes between “commercially related” and “free expression” activities, and further distinguishes between “short notice” and “advanced planned” activities. UARC’s permit was governed by the standard for advanced planned free expression activities, Section 3.50.130:
Standards for issuance of permit— Advanced planned free expression activities.
The events coordinator shall issue an advanced planned free expression activity permit if the events administrator finds that the provisions of Sections 3.50.110A (arterial routes), 3.50.110B (interference with other events), and 3.50.110C (movement of police and fire vehicles) are met.
Sections 3.50.110A and C assure that major traffic routes remain accessible and that demonstrations do not interfere with public safety vehicles. Section 3.50.110B prohibits interference with:
1. Any other commercially related special event,
2. Any other event for which a permit under this chapter has already been granted, [or],
3. The providing of city services in support of other scheduled events, including free expression activities and unscheduled governmental functions such as visits of chiefs of state.
These provisions give priority to commercially related special events, certain governmental functions, and other events for which a permit was previously granted. They make no reference to the content of the expressive activity, and do not authorize the events coordinator to take the content of the expressive activity into account. In accordance with this provision, the City gave priority to the official Olympic events organized by the Salt Lake Organizing Committee (“SLOC”), which had submitted a prior application for a special event permit at various locations in the City.
Once the official Olympic events and provision for public health and safety services were established, the City allocated rights to use public property among the many competing applicants, including UARC. Conflicts among permit applications were governed by § 3.50.180:
Permit — Conflicting applications.
A. Conflict Priority Evaluation.
When one or more applications for a commercially related special event or advanced planned free expression activity are received for the same day and for locations or routes which are conflicting, the events coordinator shall issue a permit, subject to the other provisions of this chapter, based on the following order of priorities:
1. Events planned, organized or presented by state, federal or city governmental entities or their agents if the governmental request is made in good faith and not with the intent or purpose of improperly chilling constitutionally *1252 protected rights of competing petitioners;
2. Historic usage commercially related special events or advanced planned free expression activities where the same applicant or sponsor has been granted use of a particular city forum at a particular date, time and place for more than fifteen consecutive years;
3. If neither subsections Al or A2 are applicable, priority shall be given to a first-in-time filing.
B. Consideration for Unsuccessful Applicant. After denying the request for the time, place, manner and date, the events coordinator shall authorize the unsuccessful applicant to use an appropriate public forum at another suitable time place, date and manner.
Like Section 3.50.130, this section is entirely content-neutral. Although it gives priority to government-sponsored and historic-usage events, these categories are not based on the content of the intended speech; in other respects priority is based on the principle of first come, first served.
The Ordinance also contains provisions for expedited review of the events coordinator’s determinations:
Expedited Appeals — Free Expression Activities:
A. Determination of Claims:
The following determinations on claims regarding free expression activities may be appealed as provided below:
2. A claim by an applicant that the events review committee’s denial of a proposed route or location for an activity constitutes an inappropriate or unlawful restriction of time, place or manner restriction [sic]; or
3. Any other claim by an applicant that any action by the city regarding the proposed free expression activity imper-missibly burdens constitutionally protected rights of the applicant, sponsor, participants or spectators.
B. Process: The city acknowledges an obligation to process appeals regarding free expression activities promptly so as to not unreasonably inhibit or unlawfully burden constitutionally protected activities. To the extent possible, the appeals process related to free expression activities shall be that specified in section 3.50.190[1] of this chapter, with *1253 the times modified by the events coordinator to allow the necessary expeditious processing. In the event that the applicant for a free expression activity requires even more expeditious processing of an appeal, upon the request of the applicant, the city attorney may advise the mayor or the mayor’s designee to make immediate consideration of the appeal.
Code § 3.50.210. Applicants have the right to seek judicial review of the outcome of this appeal process. See, e.g., Walker v. Weber County, 973 P.2d 927, 929-30 (Utah 1998) (holding that the writ provision of Rule 65B was properly invoked to allow Utah Supreme Court to determine whether county officials improperly changed a ballot initiative); Renn v. Utah State Bd. of Pardons, 904 P.2d 677, 682 (Utah 1995) (suggesting that an appeal of decision was also available under the writ provisions of Rule 65B of the Utah Rules of Civil Procedure); KUTV, Inc. v. Conder, 668 P.2d 513, 517 (Utah 1983) (noting that a writ was properly invoked in First Amendment context when no other adequate remedy by way of appeal was available).[2]
It is undisputed that the Ordinance, as it existed at the time of this dispute, contained no requirement that the events coordinator process permit applications for “advanced planned free expression activities” within any particular time.
On May 7, 2002, after the events at issue in this case but before the district court held argument on the motions for summary judgment, the City amended its ordinance concerning special events to require all permits for demonstrations to be acted upon within 28 days. See Affidavit of Boyd A. Ferguson (“Ferguson Aff.”), App. 137-40.

B. UARC’s Application

Almost a year in advance of the Olympics, on March 9, 2001, UARC applied for permits to demonstrate on public property at five locations it expected would be close to scheduled Olympic events, including the Olympic Opening Ceremonies, figure skating events at the Delta Center, and the daily medals ceremonies. Shawn McDon-ough, the Special Events Coordinator for Salt Lake City, responded to UARC’s request by letter on April 5, 2001. In that letter, Ms. McDonough informed UARC that “[t]he City has received a prior application from the Salt Lake Organizing Committee for a special event permit for those times and areas during the Olympic Games.” [App. 39.] The letter further stated that the City would respond to UARC’s application within 90 to 120 days, that is, by August 3, 2001. The City failed to do so. Ms. McDonough subsequently explained in an affidavit that the
delay resulted from the extraordinary and unique nature of the Winter Olympics. ' On August 5, 2002[sie], the City did not yet know the configuration and exact location of the Olympic Square. The City was also then waiting for information from SLOC and various law enforcement and security agencies regarding security restrictions and regulations regarding the Olympic Square and other areas of the City.
[Affidavit of Julia S. McDonough (“McDon-ough Aff.”) ¶ 7, App. 142-43.]
Then came the terrorist attacks on September 11, 2001. As the district court *1254 observed, these attacks substantially heightened security concerns for the Winter Olympics. The City was accordingly forced to delay processing applications relating to the Olympics until law enforcement and security agencies could determine the final security rules and plans for Olympics-related areas, including the Olympic Square.
On October 8, 2001, UARC wrote the City to complain of its failure to act on the organization’s permit application. UARC informed the City that it construed the City’s failure either to approve or to deny the request as a denial of the application, and requested a review of the denial through the City’s appeal process. Oh October 15, 2001, Ms. McDonough replied to UARC’s counsel by letter, stating that any appeal would be premature because its application had not yet been denied, and only a denial of the application was appeal-able -under Code § 3.50.210. [McDonough Aff. ¶ 9, App. 143.] She explained in the letter that .
The City is in the process of preparing the Salt Lake City Olympic Committee’s (“SLOC”) Large-Scale Special Event permit for the 2002 Olympics. The permit will determine which locations, if any, within the Olympic Square that the City can reserve for demonstrations. Until that determination is made, the City cannot deny or approve .your client’s applications because the UARC’s requested protest areas may or may not be within the approved demonstration locations.
[Letter from S. McDonough to B. Barnard (Oct. 15, 2001), App. 44.] The letter indicated, however, that the SLOC permit would be completed soon.
On October 22, 2001, UARC filed a complaint in federal district court pursuant to 42 U.S.C. § 1983, alleging that the then-applicable Section 3.50 was unconstitutional both on its face and as applied to UARC, because of the delay in processing UARC’s permit application. UARC requested a temporary restraining order and preliminary and permanent injunctions requiring the City to process its application. It further requested nominal damages and declaratory relief finding that the City had violated UARC’s constitutional rights under the First and Fourteenth Amendments.
On November 15, 2001, “as soon as the City learned of the final rules and security plans” regarding the areas UARC proposed as its demonstration sites, Ms. McDonough notified UARC that its application for protest permits at the particular locations UARC had requested had been denied, and suggested several alternative locations for UARC’s demonstrations. [McDonough Aff. ¶ 10, App. 143.] Then on November 29, 2001, Ms. McDonough received a letter from UARC modifying the group’s prior application. UARC requested permission to demonstrate at the following locations: 1) on the blacktop or sidewalk of North Temple west of 400 West; and 2) on the blacktop of Pierpont Avenue, 30 feet west of 300 West. [McDonough Aff. ¶ 11, App. 143.]
On February 4, 2002, the City approved the requested location on Pierpont Avenue and a location very close to the other requested site, on a parking strip on the west side of 400 West, approximately 200 feet north of the north curb face on North Temple. [Id. ¶ 12, App. 143-44.] In addition, UARC was given permits to protest at two additional sites close to Olympic events: at Washington Square and on 500 South close to Rice-Eccles Stadium, the venue for the Olympics’ Opening and Closing Ceremonies. [Id.'] UARC apparently conducted demonstrations at these sites.

*1255
C. Proceedings in District Court

The district court addressed both UARC’s facial and as-applied claims on UARC’s motion for summary judgment. Although the City did not formally file a cross-motion for summary judgment, the district court noted that the City essentially asked for summary judgment in its responsive pleadings. The court then exercised its discretion to treat the City’s pleadings as a cross-motion for summary judgment, and granted the City summary judgment on all claims. The court held that UARC lacked standing to bring its as-applied challenge and, in the alternative, that the as-applied challenge failed on the merits. It also held that the facial challenge was moot because the City had amended the ordinance in such a way that it addressed UARC’s concerns.
Of special relevance to our disposition of this appeal, it is important to note, as did the district court, that “UARC’s complaint challenges only the City’s delay in processing the March application — that is, the delay from the application on March 9 to the denial on November 15. At argument on this matter, counsel for UARC agreed that the only issue before the Court is appropriateness of the delay from March 9 to November 15.” Op. 5. Thus, neither in district court nor in this Court have Appellants challenged either the delay in processing their revised application — from November 29, 2001, to February 4, 2002— or the adequacy of the locations at which they were permitted to demonstrate.
II. JUSTICIABILITY
The Constitution commands that we determine whether an Article III case or controversy is before us, whether or not the issue has been properly raised by the parties. U.S. Const, art. III, § 2. In this case, that command requires us to consider both standing and mootness. See Essence, Inc. v. City of Fed. Heights, 285 F.3d 1272, 1280 (10th Cir.2002) (standing); Citizens for Responsible Gov’t State Political Action Comm. v. Davidson, 236 F.3d 1174, 1181-82 (10th Cir.2000) (mootness). These jurisdictional limitations help to confine the exercise of judicial authority to cases of a “judiciary nature”: those brought by parties who have suffered an actual injury that can be redressed by a judgment of the court. Standing generally deals with the question of “who” and mootness with the question of “when.”

A. Standing

Standing is an essential part of Article Ill’s case-or-controversy requirement. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). There are three elements to Article III standing: 1) injury-in-fact; 2) causation; and 3) redressability. Essence, 285 F.3d at 1280. An injury-in-fact is an “ ‘invasion of a legally protected interest’ that is (a) concrete and particularized and (b) actual or imminent, i.e., not conjectural or hypothetical.” Id., quoting Defenders of Wildlife, 504 U.S. at 560, 112 S.Ct. 2130. Causation is found upon a showing that the injury is “ ‘fairly trace[able] to the challenged action of the defendant,’ rather than some third party not before the court.” Id., quoting Defenders of Wildlife, 504 U.S. at 560, 112 S.Ct. 2130 (brackets in original). Redressability requires the plaintiff to show that it is “likely that a favorable court decision will redress the injury to the plaintiff.” Id. “The burden to establish standing rests on the party invoking federal jurisdiction.” Id. When the standing issue is raised at the summary judgment stage, the party moving for summary judgment “must establish that there exists no genuine issue of material fact as to justiciability,” and “mere allegations [of injury, causation and redressability] are insufficient.” Dep’t of Commerce v. United States House of Representatives, 525 *1256 U.S. 316, 329, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999).
The district court granted summary judgment against UARC with respect to both its facial and its as-applied challenge, on the ground that “UARC has failed to show any concrete or particularized injury.” Op. 5. The district court noted that UARC claimed that delay on the City’s part hampered UARC’s ability “to organize, coordinate, etc., their activities, demonstrations, protests, etc.” Id. at 6, quoting Diener Aff. ¶ 24, App. 51. But according to the court, the organization was “unable to provide any specific examples of logistical difficulties that resulted from the City’s delay,” and admitted that it could not show any “special damages.” Id. Thus the complaint was “simply too speculative to demonstrate standing.” Op. 6.
We believe that the district court took too narrow a view of Plaintiffs injury. UARC contends that the City’s permitting scheme impermissibly delayed the process in direct contravention of the standards mandated by the Supreme Court in Freedman v. Maryland, 380 U.S. 51, 58-59, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), and FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 226, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990). Whether UARC reads those cases correctly may be a matter of some question. But we must not confuse standing with the merits. If UARC is correct on the merits, it was entitled to receive an answer to its permit application long before November, 2001, which would have given the group more time to organize its demonstration (if the permit were granted) or to pursue appeals or modified applications (if it were denied). It may be true, as the district court noted, that the organization was able to overcome any logistical difficulties caused by the delay, and to conduct demonstrations at appropriate locations during the Olympics. If UARC is correct on the merits, however, the group was entitled under the First Amendment to a more expeditious process than it received. The injury may have been small, and — as UARC concedes — insufficient to support a claim for compensatory damages; but it was not “speculative.”

B. Mootness

Mootness presents a more serious hurdle. “[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.” Arizonans for Official English v. Arizona, 520 U.S. 43, 67, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). “A case is moot when the issues presented are no longer ‘live’ or the parties lack a legally cognizable interest in the outcome.” City of Erie v. Pap’s A.M., 529 U.S. 277, 287, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000), quoting County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979). “The crucial question is whether ‘granting a present determination of the issues offered ... will have some effect in the real world.’ ” Davidson, 236 F.3d at 1182, quoting Kennecott Utah Copper Corp. v. Becker, 186 F.3d 1261, 1266 (10th Cir.1999).
The district court held that UARC’s facial challenge to Section 3.50 is moot because the City has amended the ordinance to require review within 28 days, which cures the alleged defect in the original permitting scheme. Op. 10-11. The court did not address whether the as-applied challenge was moot, and instead resolved that claim on the merits and on standing grounds.
The district court was correct that in general, “the repeal of a challenged statute is one of those events that makes it ‘absolutely clear that the allegedly wrongful behavior ... could not reasonably be expected to recur.’ ” Op. 11, quoting Davids- *1257 son, 236 F.3d at 1182, quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). Plaintiffs have “no legally cognizable interest in the constitutionality of an obsolete statute.... [Such] challenges are clearly moot.” Davidson, 236 F.3d at 1182; accord Reyes v. City of Lynchburg, 300 F.3d 449, 453 (4th Cir.2002) (noting same in context of facial First Amendment challenge to obsolete city parade regulations). UARC concedes that its “facial challenge to the ordinance and request for injunctive relief’ have been mooted by the amendment to the Ordinance. Appellant’s Br. 12 n. 1. Accordingly, the district court was correct to grant summary judgment to the City on UARC’s facial challenge to Section 3.50 insofar as UARC sought declaratory and injunctive relief.
For similar reasons, UARC’s prayer for “a temporary restraining order, a preliminary injunction and a permanent injunction against the defendants requiring them to process the applications submitted by plaintiff,” Complaint ¶ 31, App. 9, is also moot. The alleged violation took place in 2001, the Olympics have come and gone, and neither temporary restraining order, preliminary injunction, nor permanent injunction could have any present-day effect. Moreover, UARC has abandoned any claim for compensatory damages; thus, there is no claim that monetary damages could recompense the Plaintiff for prior injury. See Pl.’s Mem. Re: Pl.’s Mot. for Summ. J., App. 90, 91; see also Op. 6. Any judgment on the constitutionality of the City’s treatment of UARC’s 2001 permit application would therefore be of no legal effect. To be sure, there is a recognized exception to mootness principles when a violation is “capable of repetition, yet evading review.” Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 594 n. 6, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999); Honig v. Doe, 484 U.S. 305, 318, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). But that exception is inapplicable here, where the Ordinance has been amended to cure the alleged constitutional problem. This controversy is over, and it will not recur. Accordingly, UARC’s as-applied challenge is also moot, insofar as UARC requested injunctive relief.
However, in its complaint, in addition to declaratory and injunctive relief, UARC also sought nominal damages of one dollar in connection with both its facial and its as-applied claim. Complaint ¶¶ 32, 36, App. 10-11; see also Appellant’s Br. 12 (stating “UARC sought below (and herein seeks) nominal damages in the sum of one dollar ($1.00) as a result of harm suffered by the City’s delay and lack of specific written deadlines to process applications for permits.”).[3] It may seem odd that a complaint for nominal damages could satisfy Article Ill’s case or controversy requirements, when a functionally identical claim for declaratory relief will not.[4] But this Court has squarely so held. Comm, for the First Amendment v. Campbell, 962 F.2d 1517, 1526 (10th Cir.1992) (finding that while adoption of a new policy mooted claims for injunctive relief, “the district *1258 court erred in dismissing the nominal damages claim which relates to past (not future) conduct”) (emphasis in original); O’Connor v. City & County of Denver, 894 F.2d 1210, 1215-16 (10th Cir.1990) (same). Thus, although the conduct at issue is long past and will not be repeated, the Ordinance under challenge has been amended to correct its alleged constitutional flaw, and Plaintiff concedes that it suffered no compensable injury, under our precedents this panel is required to determine on the merits whether Defendant’s past conduct and no-longer-operative Ordinance comported with the First Amendment.
III. The Facial Constitutionality of Former Section 3.50
Regulations governing the use of public property for free expression are not “inconsistent with civil liberties but ... [are] one of thé means of safeguarding the good order upon which [civil liberties] ultimately depend.” Cox v. New Hampshire, 312 U.S. 569, 574, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). Permitting schemes are necessary to ensure that scarce space is allocated among conflicting applicants, to protect public access to thoroughfares and public facilities, and to enable police, fire, and other public safety officials to function. In general, content-neutral time, place, and manner regulations governing use of public property are permissible so long as they are narrowly tailored to serve a substantial governmental interest and leave open ample alternative channels for communication. Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).[5]
UARC does not allege that the former Section 3.50 was content-based or that its permit application was handled differently on account of the content or viewpoint of its message. Rather, UARC’s argument is based on the absence of any deadlines for grant or denial of permit applications under Section 3.50. It contends that the Ordinance is a form of prior restraint, and that the absence of written deadlines rendered the former Section 3.50 facially unconstitutional under the Supreme Court’s decisions in Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), and FW/PBS v. Dallas, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990).
In Freedman, the Supreme Court invalidated a statute under which a theater owner was required to submit any film it wished to exhibit to the State Board of Censors for advance approval. Among other constitutional defects in this scheme, the Supreme Court noted that the absence of any requirement that the approval process be completed promptly would enable the Board to censor films through delay. The Court thus held that any restraint of speech under such a scheme must “be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial administration.” 380 U.S. at 59, 85 S.Ct. 734. Similarly, in FW/PBS, the Court held that a licensing scheme for sexually oriented speech must “set reasonable time limits on the decision-maker.” 493 U.S. at 227, 110 S.Ct. 596 (plurality opinion). See also Riley v. Nat’l Fed’n of the Blind, 487 U.S. 781, 802, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) (a licensing scheme for solicitations requires definite time limits because “delay compels the speaker’s silence”); Am. Target Adver., Inc. v. Giani, 199 F.3d 1241, 1250 (10th Cir.2000) (because the plaintiff “is barred from aiding any solicitations within the state until it complies with all the Act’s *1259 requirements ... [t]he Act therefore defi-nitionally qualifies as a prior restraint”).
As the district court recognized, this case does not present the same problem posed by the prior restraint cases. In Freedman, FW/PBS, Riley, and American Target, each day of delay in acting on the application was a day in which the speaker was forced to be silent. As the district court put it: “the government was directly preventing speech at the time the challenge was brought.” Op. 6. The same is not true when the desired speech will not take place until some future date. In this case, for example, UARC’s desired demonstrations would not take place for almost a year after it filed its application. Thus, “the City’s delay in processing UARC’s application in no way prevented it from speaking.” Id. at 8. Thus, while it is true that any “restraint” on speech pursuant to a content-based licensing or censorship scheme must be limited to the “shortest fixed period compatible with sound judicial resolution,” Freedman, 380 U.S. at 59, 85 5.Ct. 734, that principle does not undermine Section 3.50, because under that section, speakers are not restrained from speaking at the time of the processing delay.
Moreover, as the district court also concluded, this case is governed not by Freedman and its progeny, which apply to content-based licensing or censorship schemes, but by Thomas v. Chicago Park District, 534 U.S. 316, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002). In Thomas, the Court upheld a municipal park ordinance requiring groups to obtain a permit before conducting activities in the parks involving more than 50 persons. The Court clarified that the procedural requirements outlined in FW/PBS, 493 U.S. at 225-27, 110 S.Ct. 596, which were spawned by the concerns of censorship present in the Freedman case, 380 U.S. at 57, 85 S.Ct. 734, were not applicable to ordinances that did not authorize a licensor to “pass judgment on the content of speech.” Thomas, 534 U.S. at 322, 122 S.Ct. 775. The Court observed that it had “never required that a content-neutral permit scheme regulating speech in a public forum adhere to the procedural requirements set forth in Freedman.” Id,[6] Those requirements were necessary only in cases where the regulators were asked to focus on, or where the regulations specifically referred to, speech of a specific content. See id. at 321, 122 S.Ct. 775 (noting that Freedman was concerned with a board’s authority to reject films that it found “obscene”); FW/PBS, 493 U.S. at 227, 110 S.Ct. 596 (similar concern when regulation singles out “sexually oriented businesses”). Among the procedural requirements the Thomas Court held inapplicable to content-neutral permit schemes is the requirement of a limit on the time during which speech can be restrained before the decisionmaker acts on the application. Instead, a content-neutral time, place, and manner regulation is constitutional provided that it contains “adequate standards to guide the official’s decision and render it subject to judicial review.” Thomas, 534 U.S. at 323, 122 S.Ct. 775. There is no requirement of a fixed statutory deadline.
UARC’s confusion on this point of law is understandable because, prior to the Thomas decision, the scope and applicability of the doctrine of prior restraint was far *1260 from clear. As the First Circuit recently observed:
Until very recently, it was unclear whether the Freedman formulation applied to content-neutral permit schemes designed to ensure public safety in a traditional public forum. Compare, e.g., Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 560, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (stating that Freedman applies in a public forum), with Poulos v. New Hampshire, 345 U.S. 395, 403, 73 S.Ct. 760, 97 L.Ed. 1105 (1953) (suggesting that a different standard applies if the license requirement reflects “a ministerial police routine”). The Supreme Court erased this uncertainty within the past few months. In Thomas, the Court clarified that Freedman’s procedural requirements do not apply to permit schemes that eschew any consideration of the content of speech.... [534 U.S. at 323, 122 S.Ct. at 775],
New England Reg’l Council of Carpenters v. Kinton, 284 F.3d 9, 21 (1st Cir.2002) (case citations shortened and parallel citations omitted).
As discussed above, Section 3.50 is content-neutral. In Rock Against Racism, the Court stated that “[t]he principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.” 491 U.S. at 791, 109 S.Ct. 2746. Section 3.50.020G provides:
“Free expression activity” means any formation, procession, or assembly upon any public street, park or other public way or other traditional public forum in a manner which does not comply with normal or usual regulations or controls and which claims that it has the purpose of engaging in constitutionally protected speech or assembly.
This provision obviously makes no reference to the content or viewpoint of “free expression” activity. In administering the Ordinance, City officials are not required — nor are they permitted' — to consider the messages applicants intend to communicate. An animal rights group receives precisely the same consideration as a pro-life demonstration, a religious vigil, or a pep rally for the local basketball team. Section 3.50 is a measure designed to preserve public safety and “coordinate multiple uses of limited space,” Thomas, 534 U.S. at 323, 122 S.Ct. 775, while maintaining public safety, without regard to the content of speech or the message or viewpoint of permit applicants.
Under the guidance of Thomas, then, our inquiry narrows to whether the regulations: 1) possess adequate standards to guide the exercise of official discretion and make possible meaningful judicial review; and 2) are narrowly tailored to a significant state interest while leaving open satisfactory alternative means of communication. See 534 U.S. at 323 & n. 3, 122 S.Ct. 775. UARC does not appear to argue that the Ordinance violates these requirements, and we therefore need not delve into them. Because there is no constitutional requirement for a fixed deadline in the context of permit applications under a content-neutral regulatory scheme, and UARC does not challenge any other aspect of the Ordinance under the Thomas criteria, we reject UARC’s facial challenge to the former Section 3.50.
IY. UARC’s As-Applied Challenge
Even apart from its facial challenge to Section 3.50, UARC contends that the City violated its First and Fourteenth Amendment rights by unreasonably delaying a decision on its permit application. Specifically, UARC contends that the roughly 240-day period from March 9, 2001, when it filed its application, to November 15, 2001, when the application was denied, was unconstitutionally protracted, *1261 and made it more difficult for UARC “to adequately orchestrate their protests and demonstrations.” Appellant’s Br. 19. UARC suggests that “a constitutionally reasonable brief period is less than 150 days and can be as long as 10 days.” Id. at 21.
We do not agree. Planning for the Winter Olympics was a mammoth undertaking, made all the more difficult by the security concerns in the wake of September 11. It was not possible to determine where any one group could demonstrate until the official Olympic events were located, security needs assessed, and competing applications taken into consideration. As of October 22, 2001, when UARC filed this lawsuit, the City had not yet finished work on SLOC’s Large-Scale Special Event Permit, which had priority. As the City events coordinator wrote to UARC on October 15, 2001:
The City is in the process of preparing the Salt Lake City Olympic Committee’s (“SLOC”) Large-Scale Special Event permit for the 2002 Olympics. The permit will determine which locations, if any, within the Olympic Square that the City can reserve for demonstrations. Until that determination is made, the City cannot deny or approve your client’s applications because the UARC’s requested protest areas may or may not be within the approved demonstration locations.
[Letter from S. McDonough to B. Barnard (Oct. 15, 2001), App. 44.] Once SLOC’s large-scale permit was issued, the City acted promptly to deny UARC’s original application and to propose acceptable alternative locales for its planned demonstrations. In light of “the extraordinary logistical, security, and other considerations involved in hosting the games,” we agree with the district court that “the City’s delay in acting on UARC’s request was reasonable.” Op. 9.
The precedents cited by UARC all involve situations where constitutionally protected speech was delayed by the slow processing of the permit applications. See Appellant’s Br. 15-22. As noted in the previous section, different constitutional considerations apply to activities planned in advance. UARC filed its permit application some eleven months before its demonstrations were to take place. It may be convenient for applicants to have nearly a year to “orchestrate their protests and demonstrations,” id. at 19, but they have no constitutional right to demand that city officials make decisions affecting countless other people so long before interrelated decisions have been made. It was reasonable for the City to work out arrangements for the location and timing of Olympic venues, along with attendant security and public health and safety concerns, and then to turn its attention to applications for demonstration permits. The City acted on UARC’s permit roughly two and a half months before the Olympics began. We consider that more than adequate, under the circumstances, to satisfy the demands of the First Amendment.[7]
We are more troubled by the fact that UARC did not receive final word on its modified application until February 4, 2002 — four days before the Winter Olympics (and UARC’s planned demonstrations) were to begin. But in district court, UARC specifically limited its constitutional challenge to “the delay from March 9 to November 15.” Op. 5. Moreover, the record contains no information regarding the process between November 15 and April 2, other than the final result. Thus, we have *1262 no basis for opining on whether the time it took the City to give final approval to the four demonstration sites on February 4 was reasonable or constitutional.
V. CONCLUSION
For the foregoing reasons, the decision of the district court is AFFIRMED.

. Section 3.50.190 makes reference to the procedures of Section 3.50.200, which provides in pertinent part:
B. Procedure. Appeals shall be made subject to the following procedure:
1. Appeals shall be filed with the events coordinator within ten business days after the events coordinator notifies the applicant or sponsor of the decision from which an appeal is taken;
3. The appeal shall specify the grounds for the appeal;
4. The events coordinator shall respond to the appeal with a written explanation of the events coordinator’s reasons for the appealed decision within seven business days from the receipt of the appeal;
5. The appeal and the events coordinator’s response shall be reviewed by the city attorney who shall, within seven business days, issue a recommendation to the mayor;
6. The mayor or the mayor's designee may schedule a hearing on the appeal or review the appeal based on the written submissions;
7. Any hearing shall be held within ten business days following the city attorney’s recommendation;
8. The mayor or the mayor's designee shall issue a decision on the appeal, in writing, within ten days from the receipt of the city attorney’s recommendation or, in the event of a hearing, within ten days from the hearing.
C. Expedition of regular appeals. If the applicant notified the events coordinator and demonstrates that the times specified above for the appeals process would unreasonably burden the applicant, the events coordinator shall shorten the times so the *1253 applicant may receive the final decision sufficiently in advance of the proposed event.
Code § 3.50.200.

. The Court in Thomas v. Chicago Park, 534 U.S. 316, 324, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002), held that writ provisions of this sort provide sufficient access for judicial review in the context of appeals of denials of permits for use of public property for First Amendment activities.

. UARC’s brief in this Court is not entirely clear about whether Appellant is appealing dismissal of its facial claim. See Appellant’s Br. 12 n. 1, 16 n. 2. At oral argument, however, when UARC's counsel was asked whether UARC’s facial challenge was moot, counsel responded that the case was moot insofar as it related to injunctive relief, but not as it related to declaratory relief and the prayer for nominal damages.

. The author of this opinion has written a concurring opinion suggesting that this Court’s precedents holding that claims for nominal damages are not moot should be overruled, or corrected by the Supreme Court.

. UARC has framed its legal argument in terms of both First Amendment and Due Process, but it has not made any analytical distinction between the two. We therefore address the issues primarily in First Amendment terms.

. FW/PBS, held that content-based prior restraints require the following procedural safeguards: "(1) any restraint prior to judicial review can be imposed only for a brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof in court.” 493 U.S. at 227, 110 S.Ct. 596.

. UARC offered no evidence regarding the amount of advance notice realistically required for a group to stage a successful demonstration, and thus raised no issue of material fact regarding the reasonableness of the two-and-one-half month period.