**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 25 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SYLVIA TANDY; NAOMI
PASSMAN; JEFF FARNEY; BETTY
ALLEN; JOEL GOERTZ; JOANN
DONNELL; VICTOR BELTZ; RON
GARNETT; MIKE GOUPIL;
CAROLYN JEFFRIES,

        Plaintiffs-Appellants-,
        Cross-Appellees.

v.

CITY OF WICHITA,

        Defendant-Appellee-
        Cross-Appellant.

Nos. 02-3329, 02-3340

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 01-CV-1097-JTM)**

---

Kirk W. Lowry, Topeka Independent Living Resource Center, Inc., Topeka,
Kansas, for Plaintiffs-Appellants-Cross-Appellees.

Jay C. Hinkel, Assistant City Attorney (Michael L. North, Assistant City
Attorney, with him on the brief), Wichita, Kansas, for Defendant-Appellee-Cross-
Appellant.

Before **MURPHY**, Circuit Judge, **BRORBY,** Senior Circuit Judge, and **O'BRIEN,** Circuit Judge.

**MURPHY**, Circuit Judge.

## I.    INTRODUCTION

Plaintiffs-appellants Betty Allen, Victor Beltz, Jo Ann Donnell, Jeff Farney,[1] Ron Garnett, Mike Goupil, and Carolyn Jeffries (collectively "appellants") sued, alongside Sylvia Tandy, Naomi Passman, and Joel Goertz (collectively "cross-appellees"), defendant-appellee City of Wichita ("Wichita") in the United States District Court for the District of Kansas.  Wichita operates the Wichita Metropolitan Transit Authority ("Wichita Transit").  Appellants alleged violations of 29 U.S.C. § 794 ("Rehabilitation Act") and of Title II of the Americans with Disabilities Act ("ADA").  Almost all of the Appellants were testing Wichita Transit's compliance with the Rehabilitation Act and the ADA and did not reside in the Wichita area.  Appellants alleged that Wichita Transit's fixed-route bus system was intentionally inaccessible to and unusable by people

---

[1]On July 7, 2004, Farney filed a motion voluntarily dismissing his appeal. For that reason, this court does not address his arguments.

with disabilities.[2]  They claimed that Wichita's conduct caused them humiliation, mental anguish, and frustration.

Each appellant sought injunctive relief, declaratory relief, compensatory damages, punitive damages, costs, and attorneys' fees.  The parties filed cross-motions for summary judgment.  The district court concluded that the cross-appellees have standing to pursue their claims.  The district court, however, dismissed appellants' claims on the grounds that they each lacked standing to seek any form of relief.  Appellants argue that the district court erred by analyzing their standing in gross, and should instead have separately analyzed their standing in relation to each claim for relief.  They further argue that the district court erred in concluding that they lack standing to sue for damages, injunctive relief, and declaratory relief.

The district court partially granted cross-appellee Tandy's motion for summary judgment.  It issued an injunction against Wichita Transit's continued use of its policy of giving drivers the discretion to deny wheelchair-bound passengers access to an accessible bus on an inaccessible route, reasoning that this policy violates the ADA.  Wichita cross-appeals the grant of the injunction, arguing that the injunction was unnecessary and is now moot because Wichita

---

[2]The parties stipulated that all appellants and cross-appellees are "qualified individuals with a disability" within the meaning of the ADA and the Rehabilitation Act.

Transit's fixed-routes were scheduled to become, and have become, fully accessible to wheelchair users as of April 2002. Wichita does not appeal the district court's conclusion that its driver-discretion policy violated the ADA.

This court exercises jurisdiction over these appeals pursuant to 28 U.S.C. § 1291. In appeal No. 02-3329, this court **DISMISSES** in part for lack of Article III jurisdiction, **AFFIRMS** in part and **REVERSES** in part the district court's dismissal of appellants' claims for a lack of standing, and **REMANDS** for further proceedings not inconsistent with this opinion. In appeal No. 02-3340, this court **DISMISSES** Wichita's cross-appeal for lack of Article III jurisdiction.

## II.    BACKGROUND

The Topeka Independent Living Resource Center ("The Resource Center") is an organization which provides both direct and indirect advocacy services to the disabled community. In response to complaints about the accessibility of Wichita Transit's fixed-route bus system, The Resource Center held a training session on March 22, 2001, and advised the attendees to attempt to ride Wichita Transit's fixed-route buses and to document any problems. The purpose of these test rides was to determine Wichita Transit's compliance with the ADA and the Rehabilitation Act. Among the sixty potential testers who attended this meeting were all the plaintiffs in this lawsuit.

On the morning of March 23, 2001, fifty-eight or fifty-nine of the attendees, including all of the plaintiffs in this action, attempted to access Wichita Transit's fixed-route buses in order to test the system for accessibility. After conducting their test, the testers attended a debriefing meeting at the Hyatt Hotel to discuss their experiences. Beyond testing the buses for accessibility, appellants also attempted to use the buses to reach the debriefing meeting. Those who could not use the buses to reach this meeting had to be transported by other participants. Most appellants submitted affidavits detailing their individual experiences with Wichita Transit, including the events of March 23, 2001. These affidavits and other evidence constitute the record in this case.

Appellant Allen, who uses a power chair as a mobility aid, tested a fixed-route bus on March 23, 2001, and was delayed because of a malfunctioning wheelchair lift ("lift"). Wichita Transit has had numerous lift failures throughout the years. Evidence shows that a frequent rider experienced lift failures during twenty to thirty percent of his rides between 1994 and 1998. Allen testified that she intends to use Wichita Transit's fixed-route bus service several times per year for both personal transportation and to "test it for access and compliance with the ADA and the Rehabilitation Act" and, during May 2002, "to check on whether the new buses have arrived and are accessible."

Appellant Beltz used a power chair as a mobility aid. While conducting a test on March 23, 2001, Beltz was denied access to a bus on a fixed-route which Wichita Transit had designated as inaccessible to wheelchair-bound riders ("inaccessible route").[3] Beltz testified that he intended to test Wichita Transit's fixed-route bus service several times per year.

Appellant Donnell is blind and reads Braille. On March 23, 2001, she took a test ride on a Wichita Transit fixed-route bus. The bus driver did not offer her a seat designated for disabled individuals and did not call out stops. At the transit center where passengers access buses, Donnell found no Braille schedules or directories. She found Braille signage only on the pillars. On a different occasion, Donnell read some of Wichita Transit's Braille schedules and claimed that they made no sense. Donnell testified that she intends to test Wichita Transit's fixed-route bus service several times per year.

A driver's failure to call out stops or to offer a designated seat on the bus is against Wichita Transit's policy and training. Another blind user of Wichita Transit, however, filed complaints stating that fixed-route bus drivers regularly

---

[3]"Accessible" routes were operated only with buses equipped with lifts. Although most buses on "inaccessible" routes did not have lifts, some of the buses on such routes had operational lifts.

fail to call out stops. In March 2001, Braille materials were kept at the operations center and could be delivered to the transit centers in under five minutes.[4]

Appellant Garnett uses a power chair as a mobility aid. Some evidence in the record indicates that Garnett was one of the testers who attempted to board Wichita Transit's fixed-route buses on March 23, 2001. Garnett was denied a ride because of a broken lift. Unlike the other appellants, Garnett did not file an affidavit stating an intent to use Wichita Transit's fixed-route buses in the future.

Appellant Goupil uses a manual wheelchair as a mobility aid. On March 23, 2001, Goupil conducted a test on a fixed-route bus and was denied a ride because of a malfunctioning lift. Goupil testified that he intends to test Wichita Transit's fixed-route service several times per year starting in May 2002.

Appellant Jeffries is deaf and uses a Telecommunications Device for the Deaf ("TDD") to communicate by phone. On April 5, 2001, and several times thereafter, Jeffries tested Wichita Transit's TDD line and found that it was not working. The TDD line did not work when others attempted to call it between January and August of 2001.[5] Jeffries testified that she intends to call Wichita Transit's TDD line once per month "to make sure it is in working order."

---

[4]Braille "materials" are now kept at the transit centers. The record does not specify what those "materials" are. Wichita Transit also ordered updated Braille "materials" prior to the filing of this suit.

[5] Wichita Transit has introduced evidence that it has an operational TDD system which has been in existence since 1993.

The appellants and cross-appellees produced evidence that, at the commencement of this action in April 2001, it was known Wichita Transit had a history of unreliable service to disabled riders. Furthermore, in the 1980s, Wichita Transit bolted shut the lifts on its buses because it did not want to maintain them. In the ten years prior to the commencement of this action, Wichita Transit received over $50 million from the Federal Transit Authority to buy and maintain handicap accessible buses, to operate its transit system, and to build accessible facilities. At the time this case was filed in April 2001, Wichita Transit still designated several of its fixed bus routes as inaccessible.[6] In the pretrial order, Wichita Transit stipulated that "[i]t is and has been the policy of Wichita Transit to designate certain bus routes as not accessible. . . . This designation allows the City to utilize buses not equipped for handling disabled passengers for the full useful life of those vehicles." Prior to the commencement of this suit, Wichita Transit had ordered buses which were expected to make its fixed-routes 100% accessible to mobility impaired riders.[7] These buses were scheduled to be delivered by April 2002.

---

[6]In April 2001, four of Wichita Transit's eighteen fixed bus routes were designated as inaccessible to passengers who use wheelchairs. Wichita Transit ran two or three buses per route. A total of 34 buses service the routes during peak time. Wichita had 35 buses with lifts and 14 without lifts. Twenty percent of the bus fleet could be out of service at any given time.

[7]Indeed, all the buses on Wichita Transit's fixed-routes have been accessible to mobility impaired riders since the spring of 2002.

When this case was commenced, Wichita Transit gave its drivers discretion to refuse to deploy lifts for disabled persons who attempted to board an accessible bus on an inaccessible route ("driver-discretion policy").[8]

Wichita Transit trained its bus drivers to call out stops at major intersections, to operate lifts, to tie down wheelchairs, and to call for alternative transportation in the event of lift failure on accessible routes. Wichita Transit disciplines its drivers who fail to follow these instructions. Wichita Transit introduced evidence that it conducts regular maintenance of its lifts.

## III. DISCUSSION

### A. STANDING[9]

This court reviews issues of standing *de novo*. *Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003). Article III of the Constitution of the United States restricts the federal courts to the adjudication of "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1; *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). The standing inquiry ensures that a plaintiff has a sufficient

---

[8]The bus drivers were supposed to inform such riders that, should they board the accessible bus, they may not be able to secure a ride back from their destination on the inaccessible route. The bus drivers then had the discretion to deploy the lifts only to the riders who, in the bus drivers' judgment, understood the repercussions of riding such a bus.

[9]Wichita argues that appellants do not have statutory standing to seek damages. This court necessarily rejects this argument because it concludes, in its Article III standing analysis, *infra*, that Title II of the ADA and the Rehabilitation Act confer standing to the outer limits of Article III.

personal stake in a dispute to ensure the existence of a live case or controversy which renders judicial resolution appropriate. *See Allen v. Wright*, 468 U.S. 737, 750-51 (1984).

To establish Article III standing, a plaintiff must show that: (1) she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action[10] of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by the relief requested. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000); *Steel Co.*, 523 U.S. at 103; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (holding that to satisfy the traceability requirement, the injury must not result from the independent action of some third party not before the court).

The "injury in fact" requirement is satisfied differently depending on whether the plaintiff seeks prospective or retrospective relief. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02, 105 (1983). To seek prospective relief, the plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future. *Id.* at 101-02, 107 n.8. Past wrongs are evidence bearing on whether there is a real and immediate threat of

---

[10]The threshold standing inquiry in no way depends on the merits of a plaintiff's contention that the challenged conduct is illegal. *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990).

-10-

repeated injury. *Id.* at 102. The threatened injury must be "certainly impending" and not merely speculative. *See Laidlaw*, 528 U.S. at 190 (quotation omitted). A claimed injury that is contingent upon speculation or conjecture is beyond the bounds of a federal court's jurisdiction. *See Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). A plaintiff seeking retrospective relief, on the other hand, satisfies the "injury in fact" requirement if she suffered a past injury that is concrete and particularized. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 210-11 (1995).

Standing must be analyzed from the facts as they existed at the time the complaint was filed. *See Laidlaw*, 528 U.S. at 184. Nevertheless, standing is not a mere pleading requirement. *See Defenders of Wildlife*, 504 U.S. at 561. Each element of standing must be supported with the manner and degree of evidence required at the pertinent, successive stages of the litigation. *Id.* Thus, at the summary judgment stage, the elements of standing must be set forth, through specific facts, by affidavit or other evidence. *Id.* Furthermore, a plaintiff must demonstrate standing separately for each form of relief sought. *Laidlaw*, 528 U.S. at 185. In accordance with these principles, this court proceeds to analyze each appellant's standing to pursue each claim of relief.

   **1. Standing to Seek Prospective Relief**

      *a. Allen*

Appellant Allen has standing to seek prospective relief. Allen has established that she is under a real and immediate threat of repeated injury. Allen has used the fixed-route bus service in Wichita for many years and has averred an intent to use Wichita Transit's bus system for personal transportation several times per year in the future. In the past, her travels were delayed because of a lift malfunction. The record shows that historically, a frequent Wichita Transit fixed-route bus rider experienced lift malfunctions twenty to thirty percent of the time. Under these circumstances, Allen has established that she is under a realistic threat of experiencing a lift malfunction[11] during at least twenty percent of her several yearly attempts to use Wichita Transit's buses. This suffices to establish an injury in fact.

Moreover, Allen's averred intent to use Wichita Transit's buses "several times per year" is not a mere "someday intention." Speculative, "someday" intentions do not support standing to seek prospective relief. *See Defenders of Wildlife*, 504 U.S. at 564; *Animal Legal Def. Fund, Inc. v. Espy*, 23 F.3d 496, 500-01 (D.C. Cir. 1994) (holding that intent to undertake research at some unidentified future time is not sufficiently imminent to support standing to seek an injunction). Allen's testimony of an intent to use buses "several times per

---

[11]This threshold standing inquiry in no way depends on the merits of the contention that Wichita Transit's lift malfunctions are illegal. *See Whitmore*, 495 U.S. at 155.

-12-

year" suggests a concrete, *present* plan to use Wichita Transit's fixed-route buses several times *each* year, including the year in which she made that statement. In contrast, the plaintiffs in *Defenders of Wildlife*, whom the Supreme Court held did not show an "injury in fact," had merely expressed a desire to *someday* visit places halfway around the world. *See Laidlaw*, 528 U.S. at 184 (discussing *Defenders of Wildlife*); *Defenders of Wildlife*, 504 U.S. at 564. Unlike Allen, those plaintiffs had neither *present* concrete plans nor any specification of *when* "someday" would be. *See Defenders of Wildlife*, 504 U.S. at 564. Allen's intent to use Wichita Transit's buses "several times per year" cannot be equated with the *Defenders of Wildlife* plaintiffs' mere intent to return to foreign countries at "some indefinite future time."[12] *Id.* at 564 n.2. Thus, Allen has established an injury in fact that is sufficiently impending to support standing to seek prospective relief.

Furthermore, Allen's injury in fact is traceable to Wichita Transit's challenged conduct. It is self-evident that any threat of future lift malfunctions is traceable to Wichita Transit's alleged failure to maintain the lifts in operable

---

[12]All appellants except Garnett have averred their intention to use Wichita Transit's fixed-route bus services, including the Braille and TDD services, "several times per year." For the same reasons stated above, the other appellants' intent to use the services "several times per year" also cannot be equated with a "someday" intention.

condition. Thus, Allen has met the threshold standing requirement of traceability.[13]

Finally, Allen's injury is redressable by the requested prospective relief. "It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress." *Laidlaw*, 528 U.S. at 185-86. Both injunctive and declaratory relief can effectively abate Wichita Transit's alleged injurious conduct and prevent its recurrence. It is therefore likely, and not merely speculative, that an injunction or a declaratory judgment would remedy Allen's injury in fact. Thus, Allen has standing to seek prospective relief.

### b. *Beltz and Goupil*

This court need not resolve the question whether Beltz had initial standing to sue for prospective relief because it concludes, *infra*, that his claims for prospective relief have been mooted by his death.

Goupil's claim for prospective relief, on the other hand, is not moot. As explained above, disabled riders who intend to ride Wichita Transit's fixed-route

---

[13]Wichita Transit claims that it conducts regular lift maintenance. This assertion, which relates to the merits of Allen's ADA and Rehabilitation Act claims, is irrelevant to standing. *See Whitmore*, 495 U.S. at 155. Allen's injury – inability to access the bus – is surely traceable to Wichita Transit's alleged failure to maintain the lifts in operable order.

buses several times per year are under a realistic threat of experiencing a lift malfunction.

Unlike Allen, however, Goupil does not intend to use Wichita Transit's fixed-route buses for personal transportation. Instead, he averred that he will "test" Wichita Transit's fixed-route bus system "several times per year" starting in May 2002. The question whether testers have standing to sue under the Rehabilitation Act and under Title II of the ADA is an issue of first impression.

The Supreme Court has held that the Fair Housing Act ("FHA") supports "'tester' standing." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 374-75 (1982). In *Havens Realty*, the Supreme Court held that an African-American tester who was given misinformation about the availability of a rental property had alleged sufficient injury in fact to support standing to sue under the FHA. 455 U.S. at 374. The *Havens Realty* tester never intended to rent the apartment. *Id.* at 373. The tester's sole purpose was, like the testers in this case, to determine whether defendant engaged in unlawful practices. *Id.*

The *Havens Realty* Court held that congressional intention cannot be overlooked in determining whether testers have standing to sue under a particular statutory scheme. *Id.* The Court reasoned that the actual or threatened injury required by Article III may exist solely by virtue of a congressional "statute creating legal rights, the invasion of which creates standing." *Id.* (quotation omitted). Thus, the injury underlying tester standing stems from the denial of the

tester's statutory rights. *Id.* at 374-75. Critical to the *Havens Realty* Court's conclusion that the statutory provisions at bar supported tester standing was the language of those provisions. *Id.* at 373. FHA § 804(d), 42 U.S.C. § 3604(d), which is enforceable through § 812, *id.* § 3612(a), makes it unlawful for a firm covered by the act to misrepresent the availability of a dwelling "to *any person* because of race." *Havens Realty*, 455 U.S. at 373 (emphasis in the original). The Court reasoned that this broad statutory language, alongside the FHA's purpose of eliminating racial discrimination in housing, evinced a congressional intent to confer standing "to the full limits of Article III," which includes tester standing. *Id.* at 372-74.

Circuit courts have followed the Supreme Court's reasoning in *Havens Realty* to hold that tester standing exists under other anti-discrimination statutory provisions. *See, e.g., Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1103-04 (9th Cir. 2004) (relying on *Havens Realty* to conclude that disabled testers who sue under § 3604(f)(2) of the FHAA and who have experienced the "dignitary harm" of observing discriminatory conditions have standing); *Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 298 (7th Cir. 2000) (relying on *Havens Realty* to conclude that employment discrimination testers who were discriminated against had standing to sue under Title VII of the Civil Rights Act of 1964); *Watts v. Boyd Props., Inc.*, 758 F.2d 1482, 1485 (11th Cir. 1985) (relying on *Havens Realty* to conclude that fair housing testers had standing to sue

under 42 U.S.C. § 1982). Each of these circuits relied upon the statutory provision's broad language and anti-discriminatory purpose in concluding that testers had standing to sue. *See Smith*, 358 F.3d at 1103-04*; Kyles*, 222 F.3d at 297-99; *Watts*, 758 F.2d 1482, 1484-85.

Consistent with *Havens Realty* and other circuits' application of that holding to similarly broad language in other anti-discrimination statutes, this court holds that tester standing exists under Title II of the ADA. The *Havens Realty* Court emphasized FHA § 804(d)'s use of the phrase "any person" in concluding that this statutory language created legal rights, the invasion of which constitutes the actual or threatened injury required by Article III. 455 U.S. at 373. The language of Title II of the ADA parallels in all important respects the language of FHA § 804(d). Title II of the ADA states that "*no* qualified individual with a disability *shall*, by reason of such disability, be *excluded from participation in* . . . the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (emphasis added). The plain language of Title II evinces Congress' intent to confer upon a "qualified individual with a disability" a legal right not to be excluded from participation in the services of a public entity by reason of her or his disability. Title II's words "no" and "shall" function like § 804(d)'s phrase "any person" because, read in context, these words clearly proscribe discrimination against *any* person who is a "qualified individual with a disability."

-17-

The propriety of our construction of Title II's language is reinforced by Title II's enforcement provision. The enforcement provision extends the "remedies, procedures, and rights" under the statute to "*any person* alleging discrimination on the basis of disability in violation of [Title II]." 42 U.S.C. § 12133 (emphasis added). Moreover, the ADA, like the FHA provisions at issue in *Havens Realty*, embodies a congressional intent to eradicate discrimination. *See* H.R. Rep. No. 101-485(II), at 22 (1990), *reprinted in* 1990 U.S.C.C.A.W. 303, 304 ("The purpose of the ADA is to provide a clear and comprehensive national mandate to end discrimination against individuals with disabilities . . . ."). Thus, the totality of Title II's plain language, the plain language of its enforcement provision, and the statutory scheme's anti-discriminatory purpose lead this court to conclude that Congress intended Title II to confer standing to the full limits of Article III. *Cf. Havens Realty*, 455 U.S. at 372-74. Therefore, we hold that testers have standing to sue under Title II of the ADA.

Likewise, tester standing exists under the Rehabilitation Act. The language of the Rehabilitation Act also evinces Congress' intent to confer standing to the outer limits of Article III. Like Title II of the ADA, the Rehabilitation Act states that "*No* . . . qualified individual with a disability . . . *shall*, solely by reason of her or his disability, be excluded from [] participation in . . . or be subjected to discrimination under any program or activity receiving federal financial assistance . . . ." 29 U.S.C. § 794 (emphasis added). This language, which parallels the

-18-

language of Title II of the ADA, shows Congress' intent to confer upon a "qualified individual with a disability" a legal right not to be excluded from participation in any program receiving federal funds. The Rehabilitation Act, like Title II of the ADA, uses the words "No" and "shall" to proscribe discrimination against any person who is a "qualified individual with a disability." This creates a "legal right, the invasion of which confers standing." *Havens Realty*, 455 U.S. at 373. Thus, tester standing exists under the Rehabilitation Act.[14]

The parties stipulated that Goupil and all appellants and cross-appellees in this case are "qualified individuals with a disability" within the meaning of the ADA and the Rehabilitation Act. Therefore, all appellants would have standing as testers if they satisfy the constitutional requirements of Article III. *See Havens Realty*, 455 U.S. at 372-73.

Goupil has tester standing to seek prospective relief. He established the requisite injury in fact because he is under a real and immediate threat of experiencing a lift malfunction. *See Lyons*, 461 U.S. at 102. Goupil averred that he intends to test Wichita Transit's fixed-route services several times per year, starting in May 2002. The record shows that historically, a frequent Wichita Transit fixed-route bus rider experienced lift malfunctions twenty to thirty percent

---

[14]Because Congress conferred standing under Title II of the ADA and under the Rehabilitation Act to the full limits of Article III, this court cannot employ prudential considerations to deprive the appellants-testers of standing. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982).

of the time. At the time this case was filed, the expected arrival of Wichita Transit's new bus fleet in April 2002 had no impact on the likelihood or frequency of continuing lift malfunctions. Thus, Goupil has established that, as a tester, he is under a real and immediate threat of experiencing lift malfunctions in at least twenty percent of his several yearly attempts to use Wichita Transit's fixed-route buses.

This injury in fact is traceable to Wichita Transit's allegedly wrongful failure to maintain its lifts in operable condition. It is redressable by a declaratory judgment stating the wrongfulness of lift malfunctions or an injunction requiring fully functioning lifts. Therefore, Goupil has standing to seek prospective relief.

### c. *Donnell*

Donnell has standing to seek prospective relief against the unavailability of Braille schedules, directories, and signage at the transit centers. She has established that she is under a real and immediate threat of repeated injury. Donnell averred that she intends to test Wichita Transit's fixed-route buses several times per year. At the commencement of this case, Wichita Transit's transit centers did not house any Braille materials and had limited Braille signage. Donnell's intended tests of the fixed-route buses would have brought her to the transit centers. Thus, Donnell was under a real and immediate threat of repeated injury.

Donnell also satisfied the traceability and redressability prongs of the standing inquiry. Her injury in fact is causally connected to Wichita Transit's allegedly wrongful failure to provide Braille materials and adequate Braille signage at the transit centers. Donnell's threatened injury can be remedied by declaratory or injunctive relief, both of which would likely propel Wichita Transit to provide more Braille materials and signage at the transit centers. Therefore, Donnell has standing to seek prospective relief.

Donnell also sought prospective relief against the driver's failure to call out stops and failure to offer her a designated seat. Wichita Transit's drivers, however, are trained to call out stops. Furthermore, the drivers are obligated, under Wichita Transit's policies, to call out stops. Donnell's past exposure to a driver who failed to call out stops in violation of Wichita Transit's policies does not suffice to establish standing to seek prospective relief against such conduct. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102-06 (1983) (holding that to establish imminent future injury, plaintiff would have to allege either that *all* police officers *always* engaged in wrongful conduct against *all* citizens, or that defendant had ordered or *authorized* them to act wrongfully). Such an injury is too speculative even in light of the evidence that Wichita Transit's drivers often fail to call out stops. *See id.* Likewise, Donnell has neither demonstrated that drivers are authorized to decline to offer disabled passengers designated seats, or that *all* drivers *always* fail to offer disabled passengers designated seats. Thus,

Donnell has no standing to seek prospective relief requiring drivers to call out stops or to offer designated seats.

### d. *Garnett*

Garnett, on the other hand, has no standing to seek prospective relief. At the summary judgment stage of litigation, the elements of standing must be set forth by affidavit or other evidence. *Defenders of Wildlife*, 504 U.S. at 561. Mere allegations do not suffice. *Id.* Unlike the other appellants, Garnett submitted no affidavit stating an intent to utilize Wichita Transit's fixed-route buses in the future. He merely alleged, in the complaint, that he "desires" to use Wichita Transit's fixed-route bus system. Because of this case's summary judgment posture, Garnett's mere allegation does not suffice to establish that he is under a real and immediate threat of repeated injury. Therefore, Garnett has no standing to seek prospective relief.

### e. *Jeffries*

Jeffries does have standing to seek prospective relief because she established that she is under a real and immediate threat of repeated injury. Past exposure to wrongful conduct bears on whether there is a real and immediate threat of repeated injury. *See Lyons*, 461 U.S. at 102. Jeffries has averred that Wichita Transit's TDD line never worked when she called it several times in the past. Although Wichita Transit has presented evidence that it had a TDD service, Jeffries' affidavit suffices, at this stage of litigation, to show that the service has

been consistently out of order. Jeffries testified that she intends to call the TDD line once per month in the future. In light of Jeffries' testimony that the TDD system never worked when she called it, her intent to call it once per month establishes a real and imminent threat of repeated injury. *Id.*

Jeffries' injury is traceable to Wichita Transit's alleged failure to maintain an operative TDD service. It is redressable by prospective relief. Thus, Jeffries has standing to seek prospective relief.

## 2. Standing to Seek Damages

### a. *Allen, Beltz, Garnett, and Goupil*

Allen, Beltz, Garnett, and Goupil have standing to seek damages. They have established that they each suffered a past invasion of their statutory rights. Beltz and Goupil submitted affidavits stating that they were denied access to Wichita Transit's buses when they tested the system on March 23, 2001. Some evidence indicates that Garnett was among the testers who were denied rides on March 23, 2001. Allen averred that when she conducted her test ride on March 23, 2001, her travels were delayed because of a malfunctioning lift. Thus, Allen, Beltz, Garnett, and Goupil have each suffered an injury in fact.

Moreover, these appellants' actual injuries are traceable to Wichita Transit's allegedly wrongful failure to maintain its lifts in operable condition or allegedly wrongful denial of rides to disabled passengers. Further, it is likely, and not merely speculative, that compensatory or nominal damages can redress

the injuries suffered by these appellants. Therefore, they have standing to seek damages.

### b. *Donnell*

Donnell has standing to seek damages. She averred that, while acting as a tester on March 23, 2001, she was not offered a designated seat by the bus driver, the bus driver failed to call out stops, and she found no Braille schedules, directories, or sufficient signage at the transit centers. This invasion of her statutory rights establishes an injury in fact.

Donnell's injury in fact meets the traceability prong of the standing inquiry. The record shows that on March 23, 2001, Wichita Transit did not keep Braille schedules and directories at the transit centers and only had Braille signage on the pillars. Thus, Donnell's failure to find Braille schedules and directories, and the scarcity of signage at the transit centers are traceable to Wichita Transit's allegedly unlawful conduct.

Likewise, the portion of Donnell's injury in fact which stems from the driver's conduct is causally connected to the action which she seeks to have adjudicated. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982). The relevant conduct which Donnell seeks to have adjudicated is Wichita Transit's failure to comply with 49 C.F.R. § 37.167, which interprets Title II of the ADA. The language of this section is mandatory, and states, in relevant part, that "the *entity shall* announce

stops" and that "the *entity shall* ask . . . persons to move in order to allow the individual with a disability to occupy [a] seat." 49 C.F. R. § 37. 167 (b), (j)(1) (emphasis added). Thus, the conduct which Donnell seeks to have adjudicated is Wichita Transit's failure, as the"entity" in question, to comply with these provisions. Under these circumstances, Wichita Transit's policies of providing designated seats, calling out stops, and driver training, do not suffice to break the causal link between Donnell's injury in fact and the conduct which she seeks to have adjudicated. Because the conduct she seeks to have adjudicated is *Wichita Transit's* failure to comply with 49 C.F. R. § 37. 167 (b) and (j)(1), Donnell's injury in fact does not merely result from "the independent action of some third party not before the court." *Defenders of Wildlife*, 504 U.S. at 560 (quotation omitted). Therefore, the portion of Donnell's injury in fact which stems from the driver's conduct satisfies the traceability prong of the standing inquiry.

Donnell's injuries are redressable. It is likely, and not merely speculative, that compensatory or nominal damages can redress Donnell's injury in fact. Donnell therefore has standing to seek damages.

### c. *Jeffries*

Jeffries has standing to seek damages. Jeffries averred that on April 5, 2001 and several times thereafter, while acting as a tester, she could not obtain information about Wichita Transit's fixed-route buses by phone because Wichita

Transit's TDD line was not working. This establishes an injury in fact because it shows that her statutory rights were invaded.

Moreover, Jeffries has shown that her injury is traceable to the action she seeks to have adjudicated. The action she seeks to have adjudicated is Wichita Transit's alleged failure to provide her with adequate information concerning its transportation services. Although Wichita Transit's TDD line was in existence in April 2001, Jeffries' affidavit suffices, at this stage of litigation, to show that she could not obtain any information from the TDD line. Jeffries' injury is therefore traceable to Wichita Transit's allegedly wrongful failure to provide her with adequate information concerning its transportation services. This injury is redressable by compensatory or nominal damages. Therefore, Jeffries has standing to sue for damages.

## B. MOOTNESS[15]

A case, although live at the start, becomes moot when intervening acts destroy a party's legally cognizable interest in the outcome of adjudication. *See Utah Animal Rights Coalition v. Salt Lake City Corp.*, 371 F.3d 1248, 1256-57 (10th Cir. 2004). In such a case, Article III would deprive the federal courts of jurisdiction over that party's claim. *See id.* at 1255-57.

---

[15]Although the parties do not argue Article III mootness on appeal, this court has an affirmative obligation to consider this question *sua sponte*. *See Utah Animal Rights Coalition v. Salt Lake City Corp.*, 371 F.3d 1248, 1255 (10th Cir. 2004).

Beltz's claims for prospective relief are moot because he has died.[16]  Beltz'

claims for prospective relief are mooted by his death because once dead, he is no

longer under a real and immediate threat of repeated injury.  Thus, there is no

longer a live controversy with respect to Beltz's claims for prospective relief.  *See*

*Hall v. Unum Life Ins. Co. of Am.*, 300 F.3d 1197, 1207 n.5 (10th Cir. 2002)

(noting that claims for declaratory and injunctive relief are mooted by a plaintiff's

death).

In addition, the portion of appellants' claims that were based on the real

and immediate threat of being denied a ride because of the driver-discretion

policy[17] are moot.  The burden of establishing mootness by voluntary compliance

is a heavy one.  *See Laidlaw*, 528 U.S. at 189-90.  A request for prospective relief

can be mooted by a defendant's voluntary compliance if the defendant meets the

"formidable burden" of demonstrating that it is "absolutely clear the allegedly

wrongful behavior could not reasonably be expected to recur."  *Id.* at 190.  Such a

---

[16]The district court should decide on remand whether Beltz's claims for retrospective relief survive his death.  If Beltz's claims are non-surviving, his claim for damages would also be mooted.  *See Laidlaw*, 528 U.S. at 192.

[17]Goertz, Passman and Tandy all averred facts that would have supported initial standing to seek prospective relief based on a real and immediate threat of being denied a ride.  For those reasons set out *infra*, however, the Appellants' and cross-appellees' claims relating to the driver discretion policy are moot. Accordingly, the only justiciable claim presented by cross-appellees for prospective relief is the claim relating to Wichita Transit's failure to properly maintain bus lifts.  *See supra* p. 10-13.

burden will typically be met only by changes that are permanent in nature and that foreclose a reasonable chance of recurrence of the challenged conduct. *See id.* Wichita has met this burden with respect to the portion of appellants' injuries-in-fact which were based upon its driver-discretion policy. Wichita has submitted documents dated March 14 and 18, 2003, which establish that: (1) since the spring of 2002, all of Wichita Transit's fixed bus routes have been "equipped entirely with lift accessible buses"; (2) there are no remaining inaccessible bus routes; and (3) drivers are instructed to deploy lifts at all bus stops for disabled riders. This evidence establishes that both Wichita Transit's policy of designating routes as inaccessible and its driver-discretion policy have been discontinued. Nothing in the record suggests that Wichita Transit intends to resume its discontinued policies if this case is dismissed as moot. Under such circumstances, it is "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.*; *see Camfield v. City of Oklahoma City*, 248 F.3d 1214, 1223 (10th Cir. 2001) (evidence that defendant intends to resume its wrongful conduct can preclude mootness by voluntary compliance).

On remand, the district court should conduct further proceedings to decide whether any of the remaining claims for prospective relief have been mooted by any other event that has transpired since the filing of this case on April 9, 2001.[18]

---

[18]For instance, Wichita Transit has ordered new Braille materials that are now available at the transit centers. The district court should consider whether

## C. Cross-appeal Challenging the Grant of a Permanent Injunction

Despite our conclusion that the claims for prospective relief against Wichita Transit's driver-discretion policy are now moot, we need not vacate the district court's grant of an injunction against that policy. When a portion of a case becomes moot while on appeal, this court generally vacates the relevant portion of the judgment below and remands with a direction to dismiss. *See Boullion Aircraft Holding Co. v. Smith Mgmt. (In re Western Pac. Airlines, Inc.)*, 181 F.3d 1191, 1197 (10th Cir. 1999). "Vacatur, however, is an equitable remedy, and a key consideration in determining its appropriateness is whether the party seeking vacatur caused the mootness through voluntary action." *Id.* (citation omitted). The Supreme Court has cautioned that "it is far from clear that vacatur . . . would be the appropriate response to a finding of mootness on appeal brought about by the voluntary conduct of the party that lost in the District Court." *Laidlaw*, 528 U.S. at 194 n.6. Wichita has not presented any equitable consideration which would justify vacatur despite the fact that mootness was brought about by Wichita Transit's voluntary compliance. Therefore, this court declines to vacate the district court's injunction against Wichita Transit's driver-discretion policy.

---

this moots Donnell's claims for prospective relief.

## IV. CONCLUSION

For the foregoing reasons, in appeal No. 02-3329, this court **DISMISSES** in part for lack of Article III jurisdiction, **AFFIRMS** in part, and **REVERSES** in part the district court's dismissal of appellants' claims for a lack of standing and **REMANDS** for further proceedings not inconsistent with this opinion. In appeal No. 02-3340, this court **DISMISSES** Wichita's cross-appeal for lack of Article III jurisdiction.