KELLY, Circuit Judge.
Defendants-Appellants Abercrombie & Fitch Co., Abercrombie & Fitch Stores, Inc., and J.M. Hollister LLC, d/b/a Hollis-ter Co. (collectively, Abercrombie)[1] appeal from several orders by the district court holding that Hollister clothing stores violate the Americans with Disabilities Act (ADA). First, Abercrombie challenges the district court’s holding that the Plaintiffs have Article III standing. See Colo. Cross-Disability Coal v. Abercrombie & Fitch Co., 957 F.Supp.2d 1272, 1277 (D.Colo.2013). Second, it challenges the court’s certification of a nationwide class of disabled persons who shop at Hollister stores. See Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co., No. 09-cv-02757, 2012 WL 1378531, at *7 (D.Colo. 2012). Third, it challenges the court’s holding that entrances at many Hollister stores violate Title III of the ADA. See Abercrombie & Fitch Co., 957 F.Supp.2d at 1283. Finally, it challenges the court’s entry of a permanent injunction remedying those violations. See Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co., No. 09-cv-02757, 2013 WL 6050011, at *1 (D.Colo.2013). Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm in part, reverse in part, and remand for further proceedings.

Background

Plaintiff-Appellee Colorado Cross-Disability Coalition (CCDC) is a disability advocacy organization in Colorado. Aplee. Br. 7. It advocates on behalf of its members to promote “independence, self-reliance, and full inclusion for people with disabilities in the entire community.” II Aplt.App. 486. In 2009, CCDC notified Abercrombie that Hollister stores at two malls in Colorado — Orchard Town Center and Park Meadows Mall — violated the ADA. Aplt. Br. 4-5. Initial attempts to settle the matter were unsuccessful, and this litigation followed. Id. at 4.
An ADA complaint was filed by CCDC and four of its members, one of whom was Anita Hansen. I ApltApp. 24. Ms. Hansen, who uses a wheelchair for mobility, encountered accessibility obstacles at the Hollister at Orchard Town Center. Id. at 111. Because steps led to the store’s center entrance, she attempted to enter the store through an adjacent side door, which was locked. Id. at 112. A Hollister employee let her in, but once inside, Ms. Hansen had to ask employees to move tables and furniture to get about the store. Id. This experience left her “frustrated and humiliated.” Id. at 113. She had a similar experience at the Hollister at Park Meadows Mall. Id. at 114-15. The complaint alleged that these barriers, including the stepped “porch-like structure” that served as the stores’ center entrance, violated Title III of the ADA. Id. at 29-37. The Plaintiffs added class allegations to the complaint, challenging these barriers at “Hollister Co. stores throughout the United States.” Id. at 71.
*1209 ■ Abercrombie took it upon itself to correct some of these barriers. It modified Hollister stores by lowering sales counters, rearranging merchandise to ensure an unimpeded path of travel for customers in wheelchairs, adding additional buttons to open the adjacent side doors, and ensuring that the side doors were not blocked or locked. Ill Aplt.App. 782. However, one thing remained unchanged: a stepped, porch-like structure served as the center entrance at many Hollister stores.
There are two types of Hollister stores in the United States: those with center entrances that are level with the surrounding mall floor, and those like the Park Meadows Hollister[2] that feature a stepped porch as their center entrance. Aplt. Br. 5-6. These porches share a common design: the porch protrudes into the mall corridor and is covered by a terracotta roof, which gives it the look and feel of a Southern California surf shack. Id. at 6; Aplee. Br. 4. Two steps lead from the mall floor onto the porch — where clothed mannequins, upholstered chairs, and marketing images are displayed — and another two steps lead off the porch into either the “Dudes” (male) or “Bettys” (female) side of the store. Aplt. Br. 5-7; Aplee. Br. 4-5. On either side of the porch are two doors leading into the store that are level with the mall floor. Aplt. Br. 5. These doors are on the same storefront as the porch. Whether a person enters the store through one of these doors, or ascends and descends the porch, that person arrives at the same point in either the Dudes or Bettys side of the store. Id. at 6-7. The following picture, depicting the raised porch in the center and the level doors to the sides, may be a helpful reference.
[[Image here]]
After the Plaintiffs filed a third amended complaint, Abercrombie moved to dismiss arguing that the Plaintiffs lacked Article III standing. I Aplt.App. 184. The district court denied the motion, holding that the Plaintiffs alleged a “real and immediate threat” of future harm if the alleged ADA violations were not remedied. *1210 Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co., No. 09-cv-02757, 2011 WL 2173713, at *3 (D.Colo.2011). The Plaintiffs filed a motion for partial summary judgment, asking for judgment as a matter of law on whether the porch at the Park Meadows Hollister violated Title III of the ADA. I Aplt.App. 270. The Department of Justice (DOJ) filed a Statement of Interest supporting the Plaintiffs. II Aplt.App. 346. The district court granted the Plaintiffs’ motion, holding that the “steps to the center entrance are a legally unacceptable piece of [Hollister’s] branding and violate Title III of the ADA.” Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co., 835 F.Supp.2d. 1077, 1083 (D.Colo.2011).
Thereafter, four of the named Plaintiffs withdrew, and Julie Farrar, another CCDC member who uses a wheelchair, was added to join Ms. Hansen on the final complaint. II Aplt.App. 474. On the Plaintiffs’ motion, the district court certified a class defined as
all people with disabilities who use wheelchairs for mobility who, during the two years prior to the filing of the Complaint in this case, were denied the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any Hollister Co. Store in the United States on the basis of disability because of the presence of an Elevated Entrance.
Abercrombie & Fitch Co., 2012 WL 1378531, at *1.
The parties filed cross motions for summary judgment. The Plaintiffs sought summary judgment on whether all Hollis-ter stores with porches — some 249 stores nationwide — violated Title III of the ADA. II ApltApp. 698. They also sought entry of a permanent injunction remedying this nationwide violation. Id. Abercrombie sought summary judgment on standing, arguing that the Plaintiffs failed to offer proof of a concrete injury in fact. Ill Aplt.App. 946-47. It also argued that the district court’s earlier grant of partial summary judgment should be vacated because Abercrombie made changes to the Park Meadows Hollister addressing the court’s concerns. Id. at 711. The district court granted the Plaintiffs’ motion in full and denied Abercrombie’s. Abercrombie & Fitch Co., 957 F.Supp.2d at 1283-84. The court held that the Plaintiffs produced evidence of their standing and that Aber-crombie’s changes to the Park Meadows Hollister did not moot the claim against the porch entrance. Id. at 1277. The court then held that the porch structures at all Hollister stores violated Title III of the ADA. Id. at 1283.
Finally, the court entered a permanent injunction; it ordered Abercrombie to bring all Hollister stores with porches into compliance with Title III of the ADA within three years, at a rate of at least 77 stores per year. Ill Aplt-App. 1098-99. Abercrombie could do so by modifying the porches in one of three ways: (1) making the porch entrance “level with the surrounding floor space”; (2) placing a ramp on the porch; or (3) closing the porch off from “any public access.” Id. at 1098. Abercrombie appealed.

Discussion

I. Standing
This court reviews standing de novo. Tandy v. City of Wichita, 380 F.3d 1277, 1283 (10th Cir.2004). At its “irreducible constitutional minimum,” standing has three elements. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). First, a plaintiff must suffer an “injury in fact” that is actual or imminent. Id. Second, the injury must be fairly traceable to the challenged action of the defendant. Id. Third, it must *1211 be likely that the injury will be redressed by the relief requested. Id. at 561, 112 S.Ct. 2130. In response to a summary judgment motion, a plaintiff must support each element of standing by setting forth, through affidavit or other evidence, “ ‘specific facts,’ which for purposes of the summary judgment motion will be taken to be true.” Id. (citation omitted) (quoting Fed. R.Civ.P. 56(e)).
Abercrombie contends that Ms. Hansen and Ms. Farrar have not suffered a genuine injury in fact because they are ADA testers. Aplt. Br. 19-20. This court has held, however, that “testers have standing to sue under Title II of the ADA.” Tandy, 380 F.3d at 1287. We believe the same is true for Title III of the ADA. See Houston v. Marod Supermarkets, Inc., 733 F.3d 1323, 1332-34 (11th Cir.2013) (relying on Tandy and holding that testers have standing under Title III of ADA). Like Title II, Title III provides remedies for “any person” subjected to illegal disability discrimination. Compare 42 U.S.C. § 12133 (Title II), with id. § 12188(a)(1) (Title III); see also Tandy, 380 F.3d at 1286-87. Thus, anyone who has suffered an invasion of the legal interest protected by Title III may have standing, regardless of his or her motivation in encountering that invasion. However, the fact that “tester standing” exists under Title III does not displace the general requirements of standing. See Houston, 733 F.3d at 1334. Like any plaintiff, a tester must demonstrate that she has indeed suffered a cognizable injury in fact that will be redressed by the relief sought.
The “injury in fact” requirement differs “depending on whether the plaintiff seeks prospective or retrospective relief.” Tandy, 380 F.3d at 1283 (citing City of Los Angeles v. Lyons, 461 U.S. 95, 101-02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). When prospective relief—such as an injunction— is sought, “the plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future.” Id. In Tandy, we held that several ADA testers had standing to seek in-junctive relief against the City of Wichita. Id. at 1287-89. These plaintiffs were “under a real and immediate threat of experiencing a lift malfunction” on the city’s buses because they averred in affidavits an intent “to test Wichita Transit’s fixed-route services several times per year.” Id. at 1287.[3] We held that “testimony of an intent to use buses ‘several times per year’ suggests a concrete, present, plan to use” the buses “several times each year, including the year in which [the plaintiff] made that statement.” Id. at 1284; see also id. at 1285 n. 12. This contrasted with the plaintiffs in Lujan v. Defenders of Wildlife, whom the Supreme Court held “merely expressed a desire to someday visit places halfway around the world.” Id. (citing Defenders of Wildlife, 504 U.S. at 564, 112 S.Ct. 2130).
With these principles in mind, we hold that Plaintiff Julie Farrar has standing to seek prospective relief. In two affidavits, Ms. Farrar averred that she “intend[s] to ... return to” the Park Meadows Hollister, II ApltApp. 463, and that she “will likely'be going to the Park Meadows Mall at least six times per year,” id. at 644. This “six times per year” testimony has the same effect as the “several times per year” testimony in Tandy. It suggests a concrete, present plan to return to the Park Meadows Hol-lister several times—at least six—each *1212 year, including the year in which Ms. Farrar made that statement. See Tandy, 380 F.3d at 1284.
Abercrombie challenges the plausibility of Ms. Farrar’s intent to return to the Park Meadows Hollister, pointing out that she has never entered a Hollister store and that the Park Meadows Mall is not the closest to her home. Aplt. Br. 21-22; Aplt. Reply Br. 5. For the purposes of summary judgment, however, we must take the specific facts set forth in Ms. Farrar’s affidavit as true. See Defenders of Wildlife, 504 U.S. at 561, 112 S.Ct. 2130. Moreover, her claim that she will return to the Park Meadows Hollister at least six times per year is not rendered implausible by the distance between the store and her home. Ms. Farrar testified that she will go to the Park Meadows Mall more often now that her friend has moved nearby. II Aplt.App. 644, 661; see Houston, 733 F.3d at 1336-37 (ADA plaintiff suffered an injury in fact because his frequent trips to his lawyer’s offices took him near the defendant’s store, which was more than thirty miles from his home). Ms. Farrar’s testimony demonstrates that she suffers a real and imminent threat of encountering the alleged accessibility barrier at the Park Meadows Mall in the future; this injury is directly traceable to the porch at Aber-crombie’s store, and it is likely that a remedial injunction, if warranted, would redress this harm. Therefore, Ms. Farrar has standing to seek prospective relief.
Ms. Farrar sought prospective relief as the representative of a nationwide class. Because we hold that she has Article III standing to challenge the porch at the Park Meadows Hollister, we need not decide whether the other named Plaintiffs, i.e., Anita Hansen and CCDC, have standing to serve as class representatives. See Horne v. Flores, 557 U.S. 433, 446-47, 129 S.Ct. 2579, 174 L.Ed.2d 406 (2009); Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264 & n. 9, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (“[W]e have at least one individual plaintiff who has demonstrated standing.... Because of the presence of this plaintiff, we need not consider whether the other individual ... plaintiffs have standing to maintain the suit.”). However, Abercrombie insists that our standing analysis does not end at the Park Meadows Mall. It argues that Ms. Farrar lacks standing to bring a claim for nationwide injunctive relief because she does not intend to visit every Hollister store with a porch — over 230 stores nationwide. Aplt. Br. 23-24. We have no doubt that if Ms. Farrar were seeking a nationwide injunction in her own right, then she would lack standing to challenge accessibility barriers at stores she never intends to visit.[4] See Scherr v. Marriott Int’l, Inc., 703 F.3d 1069, 1075 (7th Cir.2013) (although ADA plaintiff had standing to challenge the design of a single hotel she intended to visit, plaintiff lacked standing to challenge that same design at 56 other *1213 hotels she had no plans to visit). Although the concepts of standing and adequacy of status to maintain a class action appear related, they are independent criteria and must be evaluated separately. See Hassine v. Jeffes, 846 F.2d 169, 175-76 (3d Cir.1988). The question whether an injunction may properly extend to Hollister stores nationwide is answered by asking whether Ms. Farrar may serve as a representative of a class that seeks such relief. All that is necessary to answer this question is an application of Rule 23. See DG ex rel. Stricklin v. Devaughn, 594 F.3d 1188, 1194 (10th Cir.2010). We turn to that task next.
II. Class Certification
“The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.” Wal-Mart Stores, Inc. v. Dukes, — U.S.—, 131 S.Ct. 2541, 2550, 180 L.Ed.2d 374 (2011) (internal quotation marks omitted). To justify departure from that rule, “a class representative must be part of the class and possess the same interest and suffer the same injury as the class members.” Id. (quoting E. Tex. Motor Freight Sys., Inc. v. Rodriguez, 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977)) (internal quotation marks omitted). It is “Rule 23(a) [that] ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate.” Id. Rule 23(a)’s requirements are quite familiar: (1) the class is so numerous that join-der of all members is impracticable (nu-merosity); (2) there is a question of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy). Fed.R.Civ.P. 23(a).
In addition to Rule 23(a), the class proponent must also satisfy through evidentia-ry proof at least one of the provisions of Rule 23(b). Comcast Corp. v. Behrend, — U.S. —, 133 S.Ct. 1426, 1432, 185 L.Ed.2d 515 (2013). In this case, the class was certified under Rule 23(b)(2), which requires the court to find that “the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.” Fed. R.Civ.P. 23(b)(2).
We review the standard the district court used in making its Rule 23 determination de novo, and we review the merits of that determination for an abuse of discretion. Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc., 725 F.3d 1213, 1217 (10th Cir.2013). The district court enjoys “considerable discretion” in this area, and “we defer to the district court’s certification ruling if it applies the proper Rule 23 standard and its decision falls within the bounds of rationally available choices given the facts and law involved.” Devaughn, 594 F.3d at 1194 (internal quotation marks omitted).
A. Class Standing
Before we apply Rule 23, we must address Abercrombie’s repeated contention that no one, not even the class, has standing in this case. Specifically, Abercrombie argues that the class lacks standing because the Plaintiffs “never established that there are actual, non-hypothetical class members who intend to patronize each of the Hollister stores.” Aplt. Br. 29. That is, the Plaintiffs must offer proof of “actual members of the certified class who have standing” as to the 231 Hollister stores with a porch. Id. at 30.
*1214 We have heard this argument before. In DG ex rel. Stricklin v. Devaughn, the defendants argued that “Rule 23(a)’s commonality and typicality requirements demanded that Named Plaintiffs prove all members were [injured] or are actually exposed to an imminent threat of harm as a result of’ the defendants’ actions. 594 F.3d at 1197. We rejected this argument, noting that it “conflate[d] the requirements for standing, prospective injunctive relief, and class certification.” Id. “First,” we held, “only named plaintiffs in a class action seeking prospective injunctive relief must demonstrate standing by establishing they are suffering a continuing injury or are under an imminent threat of being injured in the future.” Id. “Second, Rule 23’s certification requirements neither require all class members to suffer harm or threat of immediate harm nor Named Plaintiffs to prove class members have suffered such harm.” Id. at 1198.
Other authorities support the notion that class “standing” does not require individualized proof from class members. See Denney v. Deutsche Bank AG, 443 F.3d 253, 263 (2d Cir.2006) (noting that Article III standing does “not require that each member of a class submit evidence of personal standing”); Prado-Steiman ex rel. Prado v. Bush, 221 F.3d 1266, 1279-80 (11th Cir.2000) (Court must first determine whether “at least one named class representative has Article III standing,” then “question whether the named plaintiffs have representative capacity, as defined by Rule 23(a), to assert the rights of others.”). Three Justices of the Supreme Court favorably quoted this principle from a leading class action treatise:
“[Unnamed plaintiffs] need not make any individual showing of standing [in order to obtain relief].... Whether or not the named plaintiff who meets individual standing requirements may assert the rights of absent class members is neither a standing issue nor an Article III case or controversy issue but depends rather on meeting the prerequisites of Rule 23 governing class actions.”
Lewis v. Casey, 518 U.S. 343, 395-96, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (Souter, J., concurring) (alterations in original) (ellipses added) (quoting 1 H. Newberg & A. Conte, Newberg on Class Actions § 2.07, pp. 2 — 40 to 2-41 (3d ed.1992)). The majority seemed to agree, pointing out that its holding did “not rest upon the application of standing rules.” See id. at 360 n. 7, 116 S.Ct. 2174.[5]
Thus, the question whether this class may seek nationwide injunctive relief is not answered by demanding proof of standing from each class member but by application of Rule 23.
B. Numerosity
“The burden is upon plaintiffs seeking to represent a class to establish that the class is so numerous as to make joinder impracticable.” Peterson v. Okla. City Hous. Auth., 545 F.2d 1270, 1273 (10th Cir.1976). “The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations.” *1215 Gen. Tel. Co. of the Nw., Inc. v. Equal Emp’t Opportunity Comm’n, 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). Plaintiffs must offer “some evidence of established, ascertainable numbers constituting the class,” but there is “no set formula to determine if the class is so numerous that it should be so certified.” Rex v. Owens ex rel. Okla., 585 F.2d 432, 436 (10th Cir.1978).
Abercrombie argues that the Plaintiffs failed to meet the numerosity requirement because “they presented no evidence regarding the size of their proposed class.” Aplt. Br. 50. This court has said, however, that the numerosity requirement is not “a question of numbers.” Horn v. Associated Wholesale Grocers, Inc., 555 F.2d 270, 275 (10th Cir.1977). Rather, there are a several “factors that enter into the impracticability issue.” Id. Such factors may “in-clud[e] the nature of the action, the size of the individual claims, and the location of the members of the class or the property that is the subject matter of the dispute.” 7A Charles Alan Wright, Arthur R. Miller & Marry Kay Kane, Federal Practice and Procedure § 1762, at 206-07 (3d ed.2005) (footnote omitted). “[Bjeeause it is such a fact-specific inquiry, we grant wide latitude to the district court in making this determination,” and we defer to its determination if the court “made an appropriate judgment call.” Trevizo v. Adams, 455 F.3d 1155, 1162 (10th Cir.2006).
In this case, the district court had before it several facts that pointed to the existence of a class so numerous that joinder would be impracticable. At the time of the court’s certification decision, it was undisputed that porches were present at nearly 250 Hollister stores in over 40 states. II Aplt.App. 451-58, 688. Moreover, CCDC submitted declarations from five of its members who averred that they shop at malls where Hollister stores are located. I Aplt.App. 111-28. It is undeniable, and subject to judicial notice, that there are millions of Americans with disabilities. See Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 370, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) (citing the congressional finding that “some 43,000,000 Americans have one or more physical or mental disabilities”). It was therefore reasonable to infer that a substantial number of disabled people live in the 40 states where’ Hollister stores are located; that these people, like CCDC members and many Americans, shop at malls, including the 250 malls with porched Hollisters; and that joining all of these people in one suit would be impracticable. The district court did not abuse its discretion in so finding.
The dissent suggests that we have weakened the evidentiary burden a class proponent faces on the numerosity element. To be sure, this class was defined only to include those who have suffered a past injury. See Abercrombie & Fitch Co., 2012 WL 1378531, at *1. But the only relief sought by this class was prospective in nature. We agree with the dissent that whether the class was defined only to include those suffering a past injury does not bar certification. As we see it, the timing of the class’s injuries has little effect on the issue of impracticability: identifying, locating, and joining individuals who encounter accessibility discrimination at shopping malls in 40 states would be impracticable, regardless of whether the injury occurred in the past, is ongoing, or will occur in the future. See Pederson v. La. State Univ., 213 F.3d 858, 868 n. 11 (5th Cir.2000) (“ ‘[Jjoinder of unknown individuals is certainly impracticable,’ ” and “the fact that the class includes unknown, unnamed future members also weighs in favor of certification.”) (first quoting Jack v. Am. Linen Supply Co., 498 F.2d 122, 124 (5th Cir.1974)). Overtiming the dis *1216 trict court’s class certification determinations would be substituting our discretion for that of the district court — something we are not empowered to do.
C. Commonality, Typicality, and Adequacy
Abercrombie argues that the Plaintiffs failed to meet Rule 23(a)’s remaining requirements — commonality, typicality, and adequacy. Aplt. Br. 51-52. Because these requirements “tend to merge,” Wal-Mart, 131 S.Ct. at 2551 n. 5, and because Abercrombie does not address them separately, we address them together.
First, Abercrombie argues that tester plaintiffs cannot assert claims common to or typical of a class of bona fide patrons. See Aplt. Br. 51-52. This argument lacks merit. As mentioned, a plaintiffs status as tester is irrelevant in determining whether she has suffered an injury in fact under Title III of the ADA. To maintain a class action, a “class representative must be part of the class and possess the same interest and suffer the same injury as the class members.” Wal-Mart, 131 S.Ct. at 2550 (internal quotation marks omitted). The interest asserted here is the same — the right to be free from disability discrimination in a place of public accommodation — as is the alleged injury— denial of that right by porches at Hollister stores.
Elsewhere, Abercrombie again raises the specter of standing and argues that, because Ms. Farrar does not intend to visit every Hollister store with a porch, she lacks standing to obtain a nationwide injunction, and her status as class representative does not cure her lack of standing. Aplt. Br. 25. This argument conflates standing and the ability to represent a class under Rule 23. What Abercrombie challenges is whether Ms. Farrar presents “questions of law or fact common to the class” and a claim “typical of’ the class when she has only visited one of the many stores against which the class seeks relief. See Fed.R.Civ.P. 23(a).
The commonality and typicality requirements of Rule 23(a) do not require that every member of the class share a fact situation identical to that of the named plaintiff. Devaughn, 594 F.3d at 1195; see also Realmonte v. Reeves, 169 F.3d 1280, 1285 (10th Cir.1999). “[D]iffering fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory.” Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir.1988). The class’s “common contention ‘must be of such a nature that it is capable of class-wide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.’ ” XTO Energy, 725 F.3d at 1218 (quoting Wal-Mart, 131 S.Ct. at 2551).
Given this authority, it is untenable to suggest that Ms. Farrar cannot represent a class unless she shares a factually identical claim with each class member — that she visit every Hollister store that the class claims violates the ADA. Her claim against the Park Meadows Hollister is “common to” the claims of the class because it raises a common question of law— whether Hollister stores’ porched entrances violate the ADA.[6] Her claim is “typical of’ the class’s even though she has *1217 not visited the remaining 230 stores. These claims are based on the same legal and remedial theory — that Title III of the ADA mandates injunctive relief against the porches.
These claims are capable of classwide resolution. In this regard, it is telling that Abercrombie does not challenge the district court’s decision to certify the class under Rule 28(b)(2), i.e., that Abercrombie “acted or refused to act on grounds that apply generally to the class, so that final injunctive relief ... is appropriate respecting the class as a whole.” II ApltApp. 695 (quoting Fed.R.Civ.P. 23(b)(2)) (emphasis added). The district court did not abuse its discretion in finding the requirements of Rule 23(a) and (b)(2) met, and it appropriately certified the class. We now turn to the merits of the class’s ADA claim.
III. ADA Violation
In 1990, Congress passed the ADA “to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.” 42 U.S.C. § 12101(b)(1). Title III of the ADA “prohibits discrimination against the disabled in the full and equal enjoyment of public accommodations.” Spector v. Norwegian Cruise Line Ltd., 545 U.S. 119, 128, 125 S.Ct. 2169, 162 L.Ed.2d 97 (2005). Clothing stores, like Hollister, are public accommodations. 42 U.S.C. § 12181(7)(E). Title III provides that
No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.
Id. § 12182(a). After the ADA, all “new construction” of and alterations to public accommodations must be “accessible.” Id. § 12183(a)(1), (2). That is, discrimination under § 12182(a) includes “a failure to design and construct facilities ... that are readily accessible to and usable by individuals with disabilities.” Id. § 12183(a)(1). There are statutory exemptions, e.g. id. §§ 12182(b)(l)(A)(iii), 12183(a)(1), but none of these apply here.
Congress authorized the Attorney General to promulgate regulations implementing the directives of Title III. Id. § 12186(b). Within a year of the ADA’s enactment, the DOJ issued regulations based on ADA Accessibility Guidelines published by the Architectural and Transportation Barriers Compliance Board. 28 C.F.R. pt. 36. These guidelines now appear in Appendix D to 28 C.F.R. part 36, “1991 Standards for Accessible Design,” or simply the “1991 Standards,” id. § 36.104.
In 2010, the DOJ revised its ADA regulations. Without abrogating the 1991 Standards, the DOJ promulgated new regulations — the “2010 Standards” — that adopted newer ADA Accessibility Guidelines. See id. The 2010 Standards appear in Appendices B and D to 36 C.F.R. part 1191, and also include the requirements of subpart D of 28 C.F.R. part 36. Id. We refer to the 1991 and 2010 Standards generally as the “Design Standards.”
The Design Standards apply in phases: Public accommodations that were newly constructed or altered after January 26, 1993, but before September 15, 2010, need only comply with the 1991 Standards. 28 C.F.R. § 36.406(a) app. Those newly constructed or altered between September 15, 2010, and March 15, 2012, have the choice of complying with either the 1991 or 2010 Standards. Id. And those newly constructed or altered after March 15, 2012, must comply with the 2010 Standards. Id. There are exceptions: Any public accommodation that is required to comply with *1218 the 1991 Standards, yet does not so comply, must “be made accessible in accordance with the 2010 Standards.” Id. § 36.406(a)(5)(ii). Additionally, for public accommodations subject to the 1991 Standards,
If the 2010 Standards reduce the technical requirements or the number of required accessible elements below the number required by the 1991 Standards, the technical requirements or the number of accessible elements in a facility subject to this part may be reduced in accordance with the requirements of the 2010 Standards.
Id. § 36.211(c).
This regulatory framework sets the stage: Because the Hollister stores at issue were constructed after January 26, 1993, but before September 15, 2010, Aplee. Br. 44, they must comply with the 1991 Standards. To the extent the stores do not comply with the 1991 Standards, they must be brought into compliance with the 2010 Standards. And to the extent the 2010 Standards “reduce the technical requirements” of the 1991 Standards, Hollis-ter stores are deemed to comply with the Design Standards so long as they meet the lower requirements of the 2010 Standards.
The district court held that the porch at Hollister stores violates Title III of the ADA in three ways. First, the court held that, regardless of any compliance with the Design Standards, Abercrombie violated the “broad statutory requirements” of the ADA. Abercrombie & Fitch Co., 835 F.Supp.2d at 1082. Specifically, the raised porch violated the “overarching aims” of the ADA by providing a “different or separate” accommodation that was not “in the most integrated setting.” Id. at 1082-83 (quoting 42 U.S.C. § 12182(b)(1)(A)(iii), (B)). Second, the court held that the porch was a “space” under the Design Standards, and because Abercrombie made that space “available to individuals who do not require wheelchairs for mobility, [it] must comply with regulations governing circulation paths and accessible routes to accessible spaces.” Abercrombie & Fitch Co., 957 F.Supp.2d at 1281. Finally, as the porch was also an “entrance” under the Design Standards, the court held that the porch violated the 1991 Standard stating that the entrance used by the “majority of people” must be accessible. Id. at 1279; see also Abercrombie & Fitch Co., 835 F.Supp.2d at 1081-82.
We review a district court’s interpretation of statutes and regulations de novo. United States v. Davis, 339 F.3d 1223, 1226 (10th Cir.2003). We review the district court’s summary judgment decisions do novo, applying the same standard as the district court. Ribeau v. Katt, 681 F.3d 1190, 1194 (10th Cir.2012). Because the district court held that the porches violate the ADA on three independent grounds, we only need to find one supportable to affirm, but we must find all wanting to reverse. We analyze each in turn.
A. Statutory ADA Violations
Abercrombie argues that the district court erred by holding that a facility may violate the ADA even if it complies with the regulations regarding accessible design. Aplt. Br. 32-34, 47. It argues that no court has ever found a Title III violation based on a public accommodation’s design in the absence of a violation of the 1991 or 2010 Standards. Id. at 33. The Plaintiffs counter that whether the porch violates the broad statutory guarantees of the ADA does not depend on the porch’s design but rather Abercrombie’s use of that design. Aplee. Br. 53, 57-59. The United States, as amicus, sums up this “use” argument:
The problem is not that wheelchair users cannot enter the store and access *1219 defendants’ merchandise. Rather, it is that defendants exclude them from a part of the store that defendants themselves have made a part of the shopping experience. Having chosen to imbue the porch with such significance, the defendants cannot, as here, exclude individuals with disabilities from it and consign them to a wholly different experience.
U.S. Br. 14. Because Abercrombie “uses” its porches as the central feature of the “Hollister experience,” this argument goes, it denies disabled customers the full and equal enjoyment of that experience in violation of 42 U.S.C. § 12182(a). See Aplee. Br. 58.
There is a significant flaw in the Plaintiffs’ argument. Apart from its existence (a byproduct of its design and construction) Abercrombie doés not “use” the porch at all. It is the porch’s design (as a two-stepped, elevated structure) that denies disabled persons access to the store through the center entrance; the Plaintiffs do not point to any distinct policy or practice of Abercrombie’s that can be called a discriminatory “use” of that structure. See Aplee. Br. 5-6 (“Because the Raised Porch Entrance is inaccessible to shoppers who use wheelchairs, those shoppers must use doors at the mall level that are located to the side .... ”); id. at 47 (The porches “were constructed in violation” of the ADA.); id. at 50 (The porches violated the ADA “when built.”). Even the United States cannot keep this “use” argument straight: It first asserts that the “complaint is not the existence of an inaccessible entranceway but its idiosyncratic use as an integral part of the shopping experience.” U.S. Br. 12. It then does an about-face and states that the “claim here is that the defendants’ unnecessarily discriminatory design — which serves no functional purpose — makes wheelchair users feel unwelcome and excluded.” Id. at 17-18 (emphasis added). The fact that the Plaintiffs’ challenge the porch as it was built, calling it a discriminatory design, leads us to conclude that we are dealing with the design of the porch and the exclusive effect of that design. The sources the Plaintiffs cite bear out that the Design Standards are the appropriate measure of ADA liability in this case.
In Antoninetti v. Chipotle Mexican Grill, Inc., the Ninth Circuit held that service counters at Chipotle restaurants violated the ADA. 643 F.3d 1165, 1174 (9th Cir.2010). The case turned on the Design Standards, which require “equivalent facilitation” if counters do not meet certain height requirements. Id. at 1173 (quoting 1991 Standard 7.2(2)(iii)). The court held that Chipotle’s “policy” of showing disabled patrons samples of food and preparing food in seating areas was not “equivalent facilitation” because it denied disabled customers the full “Chipotle experience.” Id. at 1174. Chipotle’s “service or policy” violated the ADA, not because of a statutory guarantee of equal experiences, but because “it did not comply with the Guidelines.” Id.
In Fortyune v. Am. Multi-Cinema, Inc., the Ninth Circuit considered a movie theater’s “policy concerning the use of wheelchair companion seats.” 364 F.3d 1075, 1078 (9th Cir.2004). The court noted that the Design Standards were irrelevant because, unlike “cases that involve the design of a public accommodation under the ADA,” the case against the theater “concern[ed] a public accommodation’s policy regarding the use of that design (e.g., the use and availability of a companion seat).” Id. at 1085. The court held that the plaintiff established an ADA claim because the theater “employed a discriminatory policy or practice.” Id. (citing 42 U.S.C. § 12182(a), (b)(2)(A)(ii)).
*1220 The Design Standards are also instructive. The purpose of the standards is “to effectuate title III of the Americans with Disabilities Act.” 28 C.F.R. pt. 36, app. C (guidance to 28 C.F.R. § 36.101). A public accommodation that “complies with these guidelines” is deemed “accessible.” 1991 Standard 3.5. The commentary provides that
A private entity that renders an “accessible” building inaccessible in its operation, through policies or practices, may be in violation of [42 U.S.C. § 12182], For example, a private entity can render an entrance to a facility inaccessible by keeping an accessible entrance open only during certain hours (whereas the facility is available to others for a greater length of time). A facility could similarly be rendered inaccessible if a person with disabilities is significantly limited in her or his choice of a range of accommodations.
28 C.F.R. pt. 36, app. C, at 914 (guidance to 28 C.F.R. § 36.401) (emphasis added).
Unlike the case in Fortyune, we are not dealing with a public accommodation’s use of a design (e.g., a distinct policy or practice concerning to whom an accommodation is available, when an accommodation is available, or what choice of accommodations is available), but rather the design itself (i.e., the form and shape of a structure that render it inaccessible). See U.S. Br. 17 (“[T]he claim here is that the defendants] [adopted an] unnecessarily discriminatory design.”). And Antoninetti counsels that, even when dealing with a “service or policy,” Design Standards specifically addressing an issue are a better benchmark than more general prohibitions found in the statute itself. See Antoninetti, 643 F.3d at 1174; see also United States v. Hoyts Cinemas Corp., 380 F.3d 558, 566 (1st Cir.2004) (“[I]t makes more sense to focus upon a somewhat uncertain regulation directed to the very problem at hand rather than an even vaguer set of statutory provisions framed in more general terms.”).
By their own terms, the Design Standards provide the necessary guidance required to build an “accessible” structure. The ADA itself makes this clear: § 12183(a)(1) requires new construction to be “readily accessible” except where it is “structurally impracticable to meet the requirements of such subsection in accordance with standards set forth or incorporated by reference in regulations issued under this subchapter.” 42 U.S.C. § 12183(a)(1) (emphasis added). In turn, the regulations assure that a facility is “accessible” if it “complies with these guidelines.” 1991 Standard 3.5. Of course, if an entity constructs an “accessible” facility, but takes affirmative steps to bar disabled persons from enjoying it, then it has violated the ADA’s 'prohibition of providing a separate benefit “on the basis of a disability.” See 42 U.S.C. § 12182(b)(l)(A)(iii). But that is not the case here. Abercrombie built porches that, as the Plaintiffs claim, were “inaccessible” from their inception. See Aplee. Br. 50. Such a claim must be evaluated through the lens of the Design Standards; were it otherwise, an entity’s decision to follow the standards and build an “accessible” facility would have little meaning. See United States v. Nat’l Amusements, Inc., 180 F.Supp.2d 251, 258 (D.Mass.2001) (To hold that compliance with the standards is not sufficient to satisfy sections 12182 and 12183 of the ADA “would render compliance with these regulations meaningless, because a fully compliant structure would always be subject to a claim under ADA § [12182].”). The porch’s design- — and its secondary exclusive effect — must be evaluated solely under the Design Standards. The district *1221 court erred by imposing liability on Aber-crombie’s design decision based on the “overarching aims” of the ADA.
The dissent agrees with our major premise, that “we must look to the Design Standards to determine whether a defendant has discriminated in the design, construction, or alteration of a facility,” but disagrees with our conclusion that Aber-crombie did not engage in a secondary discriminatory “use” of that design. The dissent posits that Abercrombie “uses” the porch as a “branding tool, display area, and customer lounge.” However, none of these “uses” are what deny disabled people access to the porch — it is the porch itself that effects that alleged injury. In fact, the dissent points out that Abercrom-bie has an alternative design for the porch, one that incorporates the “same surf-shack motif’ but at “ground level.” By all indications, Abercrombie “uses” this design in the same manner as its stepped porches' — ■ as a “branding tool, display area, and customer lounge.” This “use” is not discriminatory in one instance and non-discriminatory in the other — -it is the design that differs between the two porch layouts, and that must be the sole source of accessibility discrimination. The Design Standards specifically address that issue.
B. Design Standard Requirements for “Spaces”
We now turn to the Design Standards. Abercrombie argues that the district court erred by holding that the porch is a “space” required to be accessible under the Design Standards. Aplt. Br. 44. After holding the porch to be a “space,” the district court noted that “if nondisabled customers can get to a space, customers who use wheelchairs have to be able to get to that space as well.” Abercrombie & Fitch Co., 957 F.Supp.2d at 1281.
The 1991 and 2010 Standards contain identical definitions of “entrance” and “space”:
Entrance. Any access point to a building or portion of a building or facility used for the purpose of entering. An entrance includes the approach walk, the vertical access leading to the entrance platform, the entrance platform itself, vestibules if provided, the entry door(s) or gate(s), and the hardware of the entry door(s) or gate(s).
Space. A definable area, e.g., room, toilet room, hall, assembly area, entrance, storage room, alcove, courtyard, or lobby.
1991 Standard 3.5; see also 2010 Standard 106.5. The 1991 Standards define “Accessible Space” as a “[sjpace that complies with these guidelines.” 1991 Standard 3.5; see also 2010 Standard 106.5 (defining “Accessible” as “[a] site, building, facility or portion thereof that complies with this part.”).
As we see it, whether the porch is a “space” is not the issue — given the definition of “space” as any “definable area,” it is hard to envision what is not a “space.” Rather, the issue is whether the regulations in fact require that all “spaces” be accessible, as the Plaintiffs contend. Aplee. Br. 45-46; U.S. Br. 11. Because the 1991 Standards distinguish between a “space” and an “accessible space,” it seems that the regulations clearly anticipated that not all “spaces” would be accessible.
The Plaintiffs take the use of “space” in the Design Standards to extremes. Their starting point is 1991 Standard 4.1.1. Aplee. Br. 46. This standard provides that “[a]ll areas of newly designed or newly constructed buildings and facilities required to be accessible by h.1.2 and h.1.8 ... shall comply with these guidelines.” 1991 Standard 4.1.1(1) (emphasis added). *1222 Contrary to the Plaintiffs’ suggestion, Aplee. Br. 45-46, this standard does not say that “all areas” must be accessible, but rather that areas must be accessible when other standards require accessibility. So we must keep looking. Turning to the first standard listed, 4.1.2 provides that an accessible route “shall connect accessible buildings, accessible facilities, accessible elements, and accessible spaces that are on the same site.” 1991 Standard 4.1.2(2) (emphasis added). Similarly, 4.1.3 requires an accessible route connecting all “accessible building or facility entrances with all accessible spaces and elements within a building or facility.” 1991 Standards 4.1.3(1) (emphasis added). By their plain text, these standards do not require “spaces” to be accessible; rather, they assume that the mentioned space is already an “accessible space,” i.e., that another standard requires it to “eompl[y] with these guidelines.” 1991 Standard 3.5.
Throughout the Design Standards, the term “space” is seldom used apart from the modifier “accessible.” See, e.g., 1991 Standard 4.3.2(2) (“At least one accessible route shall connect accessible spaces.”); id. 4.3. 10 (“Accessible routes serving any accessible spaces”); id. 4.5.1 (“Ground and floor surfaces along accessible routes and in accessible rooms and spaces”); id. 4.14.1 (“Entrances required to be accessible by 4.1 shall ... be connected by an accessible route to all accessible spaces.”). The term “accessible space” is a placeholder, used throughout the standards to denote compliance with other standards regulating areas that fall under the expansive definition of “space” (e.g., those for toilet rooms (4.22), assembly areas (4.33), entrances (4.14), and storage rooms (4.25)).
Simply put, the Plaintiffs cannot point to any standard stating that every “space” shall be an “accessible space.” The standards clearly indicate when something that qualifies as a “space” must be accessible, e.g., by stating that certain “entrances ... must be accessible.” 1991 Standard 4.1.3(8)(a)(i). But there is no similar requirement for “spaces” generally. To defer to the DOJ’s position — the “Standards guarantee people with disabilities physical access to spaces,” U.S. Br. 14— “would be to permit the agency, under the guise of interpreting a regulation, to create defacto a new regulation.” Christensen v. Harris Cnty., 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). The standards are not ambiguous: the expansive definition of “space” is not an independent accessibility requirement. It was error for the district court to require that the porch be accessible because it is simply a “space.”[7]
The dissent reaches the opposite conclusion. Our principal disagreement concerns whether the standards require “all areas” or “spaces” to be accessible outright unless *1223 expressly exempted. As discussed, this expansive reading is untenable given the standards’ repeated reference to “accessible spaces” and the specific standards regulating those areas that fall under the definition of “space.” See Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (“[I]t is a commonplace of statutory construction that the specific governs the general.”). Even so, the idea that the porch is a “lobby” or “customer lounge” is a weak one, as the porch is not a destination in itself but a means of passage into the store. The standards provide no safety if an entity complies with the guidelines plainly regulating a contemplated feature (e.g., an “access point to a building or portion of a building or facility used for the purpose of entering,” i.e., an “entrance,” 1991 Standard 3.5) only later to be told that the feature is also a “space” that must be accessible unless fitting into a limited exemption. That is not the thrust of the highly detailed ADA regulations.
C. Entrance Standards: “Majority of People” Requirement
Abercrombie argues that the district court erred by holding that Hollister’s porches violated Design Standards regulating entrances. Specifically, it argues the court erred by finding noncompliance with 1991 Standard 4.1.3(8). Aplt. Br. 39. That standard provides that
(a)(i) At least 50% of all public entrances ... must be accessible. At least one must be a ground floor entrance. Public entrances are any entrances that are not loading or service entrances.
(ii) Accessible entrances must be provided in a number at least equivalent to the number of exists required by the applicable building/fire codes. (This paragraph does not require an increase in the total number of entrances planned for a facility.)
(iii) An accessible entrance must be provided to each tenancy in a facility (for example, individual stores in a strip shopping center).
One entrance may be considered as meeting more than one of the requirements in (a). Where feasible, accessible entrances shall be the entrances used by the majority of people visiting or working in the building.
1991 Standard 4.1.3(8).
The district court held that, despite the fact that at least 50% of Hollis-ter’s public entrances are accessible, the store violated 1991 Standard 4.1.3(8)(a) because it was “obvious” that a majority of people enter through the inaccessible porch. Abercrombie & Fitch Co., 835 F.Supp.2d at 1082; see also Abercrombie & Fitch Co., 957 F.Supp.2d at 1279. Aber-crombie raises two arguments: (1) that the 2010 Standards eliminated the “majority of people” requirement, thus releasing Aber-crombie from this burden; and (2) even if this requirement is effective, the Plaintiffs offered no evidence of how many people enter Hollister stores through the center porch compared to the two side entrances. Id. at 39. Abercrombie is correct on both points.
As mentioned, the 1991 Standard required, among several other things, that “[a]t least 50% of all public entrances ... must be accessible.” 1991 Standard 4.1.3(8)(a)(i). In 2010, the DOJ simplified its entrance standards, providing that “at least 60 percent of all public entrances shall [be accessible].” 2010 Standard 206.4.1. The 2010 Standard omits any reference to the 1991 “majority of people” language. In other words, while the 1991 Standard regulated how many and which entrances must be accessible (if feasible), the 2010 Standard simply regulates how *1224 many entrances must be accessible. The Plaintiffs’ only argument against this reading is that the DOJ intended the 2010 revision to have the “same result” as the 1991 Standard. Aplee. Br. 51 (quoting 28 C.F.R. pt. 36, app B, at 835). However, the “same result” envisioned was the overall level of accessibility, not any continued requirement about which entrances must be accessible. See 28 C.F.R. pt. 36, app B, at 835. We thus agree with Abercrombie that, by abandoning the dual requirements of the 1991 Standard in favor of a straightforward percentage-of-entrances requirement, the 2010 Standard “reduee[d] the technical requirements” of the 1991 Standard. See 28 C.F.R. § 36.211(c). Therefore, Abercrombie need only comply with the simpler method of compliance — that a certain percentage of its public entrances be accessible.[8] See 2010 Standard 206.4.1.
To be sure, the new method is simpler. Although the Plaintiffs sought summary judgment that the porch was used by a majority of people visiting or working in the store (and the district court viewed it as apparent), no evidence supports that proposition. We need not decide whether the porch designer’s intentions or actual empirical evidence concerning porch use by visitors or employees would have been necessary to create a triable issue.[9] Given three side-by-side entrances, logic alone will not suffice. The Plaintiffs assert that the porch was intended to be used by the majority of people. Aplee. Br. 50. Aber-crombie maintains that it is just as likely that the majority of people prefer a more direct route (all entrances have the same terminus) rather than ascending and descending the porch. See III Aplt.App. 728. It is an open question, and one which we do not resolve.[10]
Accordingly, we hold that each of the district court’s grounds for awarding the Plaintiffs summary judgment are unsupportable. It was error to impose liability on the design of Hollister stores based on “overarching aims” of the ADA. It was also error to impose liability based on the holding that the porch as a “space” must be accessible. Finally, it was error to hold that the porch must be accessible because *1225 it is the entrance used by a “majority of people.”
We AFFIRM the district court’s denial of Abercrombie’s summary judgment motion. We AFFIRM the district court’s certification of the class. However, we REVERSE the district court’s partial grant, and later full grant of summary judgment to the Plaintiffs, and we VACATE the court’s permanent injunction. We REMAND this case for proceedings consistent with this opinion. All pending motions are DENIED.

. Abercrombie & Fitch Stores, Inc. and J.M. Hollister LLC are wholly owned subsidiaries of Abercrombie & Fitch Co. For simplicity, this opinion refers to the defendant entities as "Abercrombie” and the public accommodation at issue as "Hollister stores” or “Hollis-ter.”

. Some Hollister stores, including the one at Orchard Town Center, have closed since the start of this case. Ill Aplt.App. 782-83. For much of the time that this case was proceeding before the district court, porches were present at 249 Hollister stores in the United States. See II Aplt.App. 688. When this appeal was briefed, that number was 231. See Aplt. Br. 3. The case is moot as to these closed stores; therefore, we will focus on the Park Meadows Hollister, which remains open.

. We held that one plaintiff lacked standing because he failed to file such an affidavit. Tandy, 380 F.3d at 1288.

. In this case, the district court held that the "individual named Plaintiffs have standing to bring a claim requesting nationwide injunc-tive relief.” Colo. Cross-Disability Coal. v. Abercrombie & Fitch, No. 09-cv-02757, 2011 WL 1930643, at *4 (D.Colo.2011). This holding seems superfluous, however, given that the individual Plaintiffs did not request a nationwide injunction to remedy their own injuries but rather to remedy the injuries of a nationwide class they sought to represent. See I Aplt.App. 203 (“In any event, if [the Plaintiffs’] claims are common with and typical of those of a nationwide class, they will be entitled to represent that class which will have standing to seek a nationwide injunction.”); Aplee. Br. 1 (The Plaintiffs "do not argue that the two individual plaintiffs have standing to obtain a nationwide injunction.”). The question whether nationwide injunctive relief may issue was more appropriately answered by asking whether a class seeking that relief should be certified.

. Abercrombie's position could be framed as an argument that nationwide injunctive relief was inappropriate because there was no proof of nationwide injuries necessitating such relief. See Lewis, 518 U.S. at 348-49, 116 S.Ct. 2174. In this case, however, we are faced with a nationwide design — "231 Hollister stores that have one elevated entry door with steps in addition to two adjacent, level, fully accessible entry doors.” Aplt. Br. 3. An injunction aimed at those and only those Hollis-ter stores fits perfectly with the claim that those stores violate class members’ rights under the ADA. Contra Lewis, 518 U.S. at 360, 116 S.Ct. 2174 (absent showing of systemwide constitutional violation, injunction with sys-temwide scope was inappropriate).

. Before the district court, Abercrombie argued that class certification was inappropriate because Hollister stores utilize varying designs in their porch layout. II Aplt.App. 690, 692. On appeal, Abercrombie does not raise this issue, and we are satisfied that the porches are sufficiently similar as to pose a common question of law.

. It was also error for the district court to impose accessibility requirements on the porch as a “space” because it contained "more than one use.” See Abercrombie & Fitch Co., 957 F.Supp.2d at 1281. The district court apparently thought the porch was used as an "accessible space” because Aber-crombie made it "available to individuals who do not require wheelchairs for mobility.” Id. A space is not an “accessible space” because it can be accessed by nondisabled persons; rather, it is an "accessible space” only if it "complies with [the] guidelines” for disabled access. 1991 Standard 3.5. The "use” envisioned by the standards refers to those "use[s] covered by a special application section,” e.g., "restaurants and cafeterias, medical care facilities, business and mercantile, libraries, accessible transient lodging, and transportation facilities.” 1991 Standard 4.1.1(2); see also 2010 Standard 201.2 (requiring multi-use spaces to comply with “the applicable requirements” for each use). The district court made no finding that the porch contained any of these special uses.

. We need not decide whether the percentage is 50% or 60%, as Abercrombie meets either. We will not consider the Plaintiffs’ argument to the contrary, Aplee. Br. 51 n. 13, as it is raised for the first time on appeal, see Valdez v. Squier, 676 F.3d 935, 950 (10th Cir.2012). In any event, their argument — that the porch actually constitutes two entrance "doors”'— fails to take into account that the standards regulate the number of "entrances,” see 1991 Standard 4.1.3 (8)(a)(i); 2010 Standard 206.4.1, and that one "entrance” may be made up of more than one "entry door(s),” see 1991 Standard 3.5.

. The regulatory guidance does not mention the "majority of people” provision, see 28 C.F.R. pt. 36, app. C, at 929 (guidance to 4.1.3(8)), nor does the analysis and commentary to the 2010 standards, see 28 C.F.R. pt. 36 app. B, at 822-23 (analysis of "Public Entrances”). No published case has ever imposed ADA liability on a public accommodation for violating the "majority of people” component of 4.1.3(8)(a).

.The dissent offers that the Plaintiffs presented “deposition testimony, declarations, photographic evidence, and architectural drawings that all support a reasonable inference that a majority of people use the porch entrance.” Responding to a summary judgment motion, Plaintiffs had the burden of providing significantly probative evidence establishing an essential element of their case. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Plaintiffs’ summary judgment evidence demonstrates nothing more than the porch’s existence positioned between two nearby doors. We simply do not know about utilization of the various entrances. Regardless, this question is now irrelevant, as we hold that the 2010 Standards effectively eliminated the additional majority-of-people requirement in the 1991 Standards.